MEMORANDUM OF DECISION
On February 18, 2000, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Robin T. and Arthur L. to their two children, Edward and David L. The children were first removed from their parents on September 11, 1996. On January 10, 1997, both were adjudicated neglected and they have remained committed to the care and custody of DCF since that time, although they were twice returned to their parents under an order of commitment and then last removed September 9, 1999.
The termination petitions alleged that the parents have failed to rehabilitate so that they could parent these children, who were adjudicated neglected in prior proceedings. Connecticut General Statutes § 17a-112 (c)(3)(B), now Connecticut General Statutes § 17a-112
(j)(3)(B). The trial on the termination petitions took place on September 25, 26, 27, and 28, 2000. Both parents attended the trial and through their counsel vigorously contested the petitions. For the reasons set forth below, the court grants the petitions and finds that it is in the best interests of the two children to terminate their biological parents' rights to them.
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Robin T., the mother of the children.
Robin is now thirty-four years old. Her own childhood was traumatic and extremely difficult. She is an only child. Her father abandoned the family when she was less than two years old and her mother suffered from alcoholism. She was raised by her mother, who left her alone much of the time. By the time Robin was ten, she ran away from home and lived in group homes, foster homes and detention facilities. She has reported that she and her mother did not get along when she was a child, although they have since repaired their relationship. Robin did not complete high school, leaving after the tenth grade, but has now received her high school equivalency diploma. She testified that she herself "was raised with the belt" and did not understand, prior to DCF's involvement, that physical discipline of her children was not acceptable behavior.
When she was fourteen years old, she had her first child, which she gave up in adoption. She and Arthur L. have never been married, but have been in a relationship for over twelve years. Their first child, Edward, was born in 1990. Their second and last child, David, was born in May, 1991, a year and five months later. She has described the relationship she has with the children's father as rocky and there have been some periods of separation. To her therapist she has frequently expressed CT Page 13445 thoughts of leaving Arthur, but feels she does not have any financial resources to do so.
(a) The first removal of the children.
It was not until Edward was over six years old and David five, that DCF removed the children after determining that the parents were using inappropriate physical discipline. In an affidavit signed by her on September 11, 1996, filed in support of the order of temporary custody, Robin is remarkably forthright about the events which took place. At about 9:30 p.m. the previous evening, the children:
 were fighting with each other, throwing things out the window and throwing things around the room and running up and down the stairs. Their father, Arthur L., went up several times and told them to go to bed. He warned them if they did not stop, they would be spanked. They didn't stop and Arthur went upstairs and spanked them with the belt.
The next day the nurse at Edward's school called DCF as she noticed a reddened area from his neck to his shoulder. When questioned, Edward reported that it was from the belt from his daddy. Robin had seen the mark the night before and admitted she too used the belt to spank the kids "when all else fails."
At trial, Robin admitted she had come to learn this was not right and testified that she now understood this but did not then. She said she too physically disciplined them at that time and hit them in the mouth if they swore. She testified that "it was difficult in that my children were very difficult to be around. . . . . . Eddie was diagnosed as ADHD, I think during that year." She stated that the school psychologist tested him that year and that he met the criteria for Attention Deficit Hyperactivity Disorder. Also, she noted, "his speech patterns were lacking and he had other developmental delays." Since that time, Edward, or "Eddie" as he is often called, has been diagnosed as mildly mentally retarded and is a child with specialized needs. She also admitted that her children had been difficult to control for a long time, mentioning that on occasion she and Arthur found them outside the home in their diapers at 4:30 in the morning when they were significantly younger.
DCF referred both parents to services to assist them in securing the return of their children. Robin attended parenting classes, from which she graduated. She also began to receive individual therapy. Arthur went to anger management classes. The court expectations[2] at the time of the neglect adjudication on January 10, 1997 required the parents to CT Page 13446 participate in family counseling, which they did. The expectations also required a substance abuse evaluation. Robin completed all these steps. She admitted she had a substance abuse history, but that she had maintained her sobriety since Edward was eight months old. There is evidence contradicting her assertions in the statements she made to her therapist between 1997 and July, 2000, documenting by her own admission, use of alcohol and marihuana during that time and the court so finds.[3]
 (b) The second and third removals of the children from the parents' home.
In 1997, the reports from the various service providers to DCF showed that the parents had made some progress and, after further assessment and participation by Robin and Arthur in a family reunification program, Edward and David were returned to their parents on August 15, 1997. On December 3, 1997, approximately four months later, the children were again removed from their parents' care. On that date, the DCF social worker was making a home visit, and the records indicate that the parents were unable to find their children for fifteen or twenty minutes. DCF had spoken with the parents about appropriate supervision of the children while in their care. David, then age six and one half years old, had ridden away on his bicycle when told to stay in the area. David was located by his father some time later at a friend's house some distance from the family home. Robin's testimony contradicts the DCF record in that she claims the child was not gone for so long and that he had come home and been grounded before the DCF worker returned from her search. Neither version differs regarding David's failure to follow his parents' directives and that he left the area on his bicycle without permission. Edward is the one who reported that David was gone and had disobeyed. Without question is the fact that the parents did not maintain physical control over David that day.
Since the children were still committed to DCF's care under the original neglect adjudication, they were immediately returned to foster care. The parents began yet another round of services to address their parenting issues. They received couples counseling and they attended a behavior management-training program to teach them how to change some of their behaviors, including their parenting behaviors. Robin continued with her individual counseling. They received hands-on parenting training through a program called Kidsafe, the type of service which had been recommended by the court appointed evaluator.[4]
The DCF worker testified that DCF had earlier made a decision to terminate the parental rights of Robin and Arthur, but had held that action in abeyance until the hands-on parenting training could be provided. Again, because there were mixed and generally positive reports from the various service providers including the behavior management CT Page 13447 training program, DCF, despite its general reservations, determined to attempt a second reunification of the parents and the children. DCF again began the steps to transition the children into the parents' home. Robin and Arthur again received the benefit of family reunification services as well as a parent aide in the home. On May 28, 1999, Eddie returned home for the last time. On July 15, 1999, after periods of increasing overnight visits, David was also returned home.
Robin testified that when Eddie came home, things went fine when he was in the home by himself. The difficulties began when David was returned. He and David, who is not as cognitively challenged, had been separated for well over a year in different foster homes, and needed to get to know each other again. While she expected some rivalry, she testified, things were far worse than she expected. The boys fought constantly and the parents were not able to control them. Both boys at separate times started fires in the home and were very angry. The DCF social worker testified that Robin called her frequently that summer and did not appear to know how to manage the children and to arrange for adequate activities to occupy their time.
Earlier, prior to the children's second return home, there had been allegations of sexual abuse of Eddie at a foster home as well as some sexual acting out and aggressive activity with other children at one of the foster homes.[5] While at the home in the summer of 1999, Eddie spoke to David about "having sex" and Robin was aware that this was a serious and difficult issue with respect to her two sons. Prior to their return, she had attended three of eight sessions of a non-offenders group concerning sexual abuse. She did not complete that program because she felt the matters being discussed were inappropriate for her. She believed the situation of others in the group to be completely different from her life. She testified that she was disgusted with the women in the group who were still living with their partners who had sexually abused their children. As with some of the other services provided to her, Robin rejected the idea that she could learn something of value and never completed this court expectation and program. Arthur did not attend and made no attempt to comply.
Because of Eddie's sexual reactivity, DCF told Robin and Arthur to seek an apartment with three bedrooms and at a minimum to keep the boys in separate bedrooms, which, after a period of time, they ignored and failed to do. Robin's excuse, during her testimony, was that David became too heavy for Arthur to carry downstairs at night when the parents wanted to use the second bedroom and he was put to sleep on the couch in the living room. Other options of the parents sleeping downstairs she rejected and it did not occur to her that perhaps one of the parents could sleep on the couch and the other upstairs until suitable bedding was located. The CT Page 13448 DCF social worker testified that she had concerns about Robin's compliance with the need to separate the boys. She suspected they were not being kept apart and eventually the children themselves told her they were sleeping in the same room and in the same bed.
But whatever the reasons Robin had for ignoring this DCF directive, her failure was a serious concern to Dr. Randall, the evaluator, and to the DCF worker. It was an example of Robin's inability and unwillingness to protect her children and keep them safe, Dr. Randall noted. While it may be called a failure to supervise, as many parenting issues have been designated in this matter, it is a more fundamental parenting failure than such a label implies. As the DCF worker who was active in the case prior to 1999 testified:
 I do not know that supervision was my major concern. Robin was not able to meet their needs twenty-four hours a day. They were very active little boys with a lot of special needs.
The court concludes that Robin, while agreeing to separate the boys, discounted the seriousness of Eddie's sexual acting out. She was not able to keep Eddie or David safe, whether or not anything of a sexual nature happened between the boys during the short time they were in the home. She determined that Arthur's unwillingness to carry David down the stairs once every evening was more important to her than preventing Eddie from sexually touching and abusing David, with whom he fought incessantly during the day.
But it was Arthur's inappropriate discipline of David that brought about the last and final removal of the children from their parents' care. Robin testified that some days prior to the removal of the boys, Eddie and David were fighting. She stated that she and Arthur made several attempts to get David to sit down and stop fighting, but he refused. "David went right back after his brother," she stated. At that point, Arthur picked up his younger son and threw him bodily on the couch. Upon questioning, she stated that Arthur was standing about four feet away from the couch when he threw David. David cut his foot on the springs of the couch as he landed with such force that a cushion flew up off the couch. She said she knew this fighting was "risky". She testified that she then talked to the boys and reported that she then told them, speaking at trial with an CT Page 13449 anxious, emotionally laden voice:
 This cannot happen. This cannot happen. Do you want to go back to foster care? We have got to make this work. You've got to do what you are told.
Robin stated that there were no more fights after this event. Robin did not report this event to DCF nor take any steps to deal with Arthur's continued and significant physical abuse of his children, which, despite all services, had not ceased in the three years of DCF involvement. Her testimony implied that Arthur and she had no other choice when the children were out of control but to physically discipline them. Her testimony also demonstrates that she placed responsibility for her own and Arthur's ineffective parenting on the boys and burdened them further by blaming them for their behavior, instead of seeking other ways to deal with their significant aggression.
A few days later, on a Friday, she testified that the DCF social worker came to the home when school was about to let out and told her that Eddie claimed his father had punched him in the head and chest. She said "I did not know what he was talking about." She stated, "First off, if he had been hit in the home, I would have known about it." She noted: "Had they actually had physical evidence, they would have arrested us as they did the first time. They had no proof."[6] DCF noted at that time there were no physical findings but that Eddie has complained to the nurse that his head hurt. The social worker presented Robin with a service agreement, which required, among other things, that Robin keep Arthur out of the home, until this matter could be investigated. The worker informed Robin if she did not do this and sign the agreement, the children would again be removed. She signed and Arthur remained out of the home until Sunday, when she permitted him to return. She testified; "there was no proof like the first time and there was no way I could explain to this man who had nowhere to go until this was done." The court notes that whether or not there was proof of this particular incident, Robin herself had witnessed the physical abuse of David earlier that week and failed to protect her child.
At that time, Edward and David were still in the home. When called by the social worker, Robin admitted that Arthur was in the home and agreed the next day to come with Arthur and the children to the DCF office. She testified that when the family arrived at the office, the DCF worker and supervisor told her that "Arthur has to go now" and then asked her "can you do this on your own. She said "no", explaining at trial that she had no income, "no nothing," and that she could not do it.[7] At that point, the children were removed for the third and last time. When cross-examined by the guardian for the children, Robin admitted that, at CT Page 13450 that time, she chose Arthur over her own two children.
(c) Services
During the course of DCF's involvement, Robin has been referred to and received many significant services. She has received individual counseling, several parenting education classes, and a family reunification program two times which included the presence of a parent aide in the home on two occasions. She and Arthur participated in nine months of a behavior management training program designed to train them to change their negative family interactions, including those with their children. She also received the benefit of a hands-on, concrete, parenting training program, Kidsafe. She received transportation assistance, a substance abuse assessment, as well as referrals to a nutritionist and a weight management program. The array of services was extensive and all-inclusive, well above what many families with DCF involvement are able to receive. Unfortunately, the record reflects that she did not participate in all of them. Further, despite those in which she did engage, she was unable to learn how to manage her children, as well as her own stress and relationship issues so that she could safely parent her children.
Since the children's last removal, Robin has continued with her individual counseling and continued to have visitation with Edward, who is placed in a therapeutic foster home in Massachusetts. Her contact with David has ended, as David's therapist has recommended that cessation of visitation is in David's best interest. There were many questions asked at trial concerning DCF's efforts to refer Robin to other programs, including assisting Robin in securing treatment for her weight. Robin is morbidly obese[8] and claims that her obesity physically limits her ability to supervise her children. Her counsel further claims that this is a matter out of her control. He implied that there is some organic reason for her obesity and that she should have received social security disability payments, which were denied to her both times she applied for these benefits.
Unfortunately, the record and Robin's own testimony does not support this claim. The DCF social workers spoke of referring her to her physician for assistance in this regard and helping secure transportation to Overeaters Anonymous, a group to which her Physician referred her. Her therapist spoke to her about her need to take care of herself and deal with her weight on many occasions. Her therapist noted on 11/5/98 that Robin avoided the issues and was evasive.[9] She also noted that Robin had been referred by her physician to a nutritionist to deal with this difficulty, a step which, like an exercise program, was never completed by Robin. The DCF worker reported Robin's lack of success in getting any CT Page 13451 program underway. Robin herself testified as to the obstacles that stood in her path in attending Overeater Anonymous and in joining a gym. While the court is not unsympathetic to the financial and other hardships which Robin faced, her reasons for not taking any steps to address this significant health problem were not persuasive. As her therapist noted on 4/27/2000, when Robin reported that she had not met with a nutritionist, she "has not mobilized to complete goal", and this after six years, if not more, of suffering from the physical effects of her obesity. The court finds from the evidence that there is no evidence that Robin's physician found an organic cause for her condition. The recommendations made which include exercise and attending a twelve-step program such as Overeater's Anonymous indicate otherwise. Robin herself has failed to take those necessary steps to confront and face her specific physical demon, her obesity. The court finds that DCF and other service providers were supportive and sensitive to Robin's needs and her problems around her weight. Many people tried many times to assist her in carrying out the recommendations made by her physician to control her weight and begin a program of reducing that weight. For her own personal reasons, Robin herself was unable to take this step.
This same inability to address critical issues and secure the assistance she needed is apparent in other areas of Robin's life. While she sought out and attended individual counseling, she refused to seek medication for the signs of depression that her treatment providers noticed. She rejected the sexual abuse counseling, finding repugnant the notion that women in the group would continue to live with the abusers of their children. While it may be that sexual abuse of children is more repugnant in the eyes of our society than physical abuse, the children on whom any such abuse is inflicted are not in a position to make such a squeamish distinction. Any form of abuse is traumatic to the children. In making her position about the sexual abuse group treatment clear, it seems to have escaped Robin's attention that she has continued to reside with a person who has regularly physically abused their children, after years of parenting training and anger management therapy. The court fails to understand and appreciate that distinction.
Robin has also not attended any meaningful couples therapy with Arthur, as required by the court expectations. While the explanation for that failure is not clear, her own, individual therapy describes years of her bleak feelings about her relationship with Arthur and her expressed desire and need to leave it. Resolution of the relationship issues was important and would have assisted her in clarifying what she needed to do herself in order to face the facts of her life, her depression and, hopefully, led to her own independent plans for her children. Had she done that, it just might have been possible that when the children were last removed, she would have been in a position to be able to care for CT Page 13452 them herself and not been hopelessly dependent on an individual who she herself realized had significant problems.
(d) The Psychological Evaluations
Three psychological evaluations were performed by Nancy Randall, Psy.D. The first was completed in 1996. After testing, interviewing and observing the parents with the children, Dr. Randall concluded about Robin:
 Her judgment is quite poor and would be expected to be more so in times of high stress. Treatment with Ms. T. could be expected to be difficult and progress slow. This is because she is resistant to accepting responsibility for her own problems and she strongly denies the need for psychological treatment.
Time has proven her opinion to be accurate as despite significant and repeated efforts, Robin cannot be said to have made any substantial progress.
As to Arthur, Dr. Randall found him to be:
 an intellectually limited man who has difficulty understanding much of what goes on around him . . . He holds in his feelings as he realizes he is often not able to express them in socially appropriate ways. Unfortunately, he has little capacity for containing his emotions for long and they quickly build up to the point that he lets them out in intense, angry outbursts.
Dr. Randall observed that both parents cared about the children, but found that they needed hands-on parenting training. She observed that: "the parents are able to verbalize an understanding of many of their children's basic needs. However, the parents do not really recognize their children's need to be safe from physical discipline." She believed that the parents did not have a good understanding of their children's needs for appropriate limits and clear expectations."
The next evaluation took place on January 3, 1998. At that point, Dr. Randall noted that "neither of the parents appears to have good control over the children's behavior. . . . Clearly, the parents are in need of substantial additional learning before they can provide a safe home to their children." CT Page 13453
The last evaluation was performed on January 19, 2000. After this last evaluation, Dr. Randall recommended termination of parental rights as being in the children's best interests. At that point in time, she noted that:
 the parents support each other in their beliefs that everything would be okay in their family if only DCF would back out of the picture. They are unrealistic about their own strengths and weaknesses and this makes it difficult to effect change in the family situation.
Dr. Randall was clear that the parents were not successful in caring for the children in their most recent reunification attempt. She observed: "there is nothing in this evaluation to suggest that the parents are likely to make notable changes in the foreseeable future which would allow them to provide a more appropriate home to their children." Dr. Randall remained pessimistic about the parents at the time of trial. She did not believe that Robin's weight was a significant issue when cross-examined at trial. She believed that the issue related more to Robin's willingness "to provide the kind of supervision that is required." While much was made of Robin's inability to chase after her children when they are riding their bicycles, the court notes that even parents who do not have her physical limitations would be unable to catch their children if those children were riding their bicycles full tilt. The point is that if control over the children has not been established by verbal means at younger ages, all children who ride bicycles could and would readily escape from their parents' control. The court agrees with. Dr. Randall that this is not the issue. The court finds, from the clear and convincing evidence, that Robin had not learned how to control her children's behavior by appropriate means, despite the many services and training programs she had been provided.
2. Arthur L., the father of the children.
Arthur L. is now forty-two years old. He, too, comes from a troubled background. As noted above, Arthur has significant intellectual impairments. He receives social security disability income due to his retardation. He is unable to read and is not employed. He, together with Robin, has received many services to learn how to parent and in particular how to refrain from the use of physical discipline. He also received the intensive behavioral management program conducted by Dr. Gibson, which continued for many weeks, and at the parents' request was continued for an additional period of time to assist them. Arthur, however, has not attended individual or couples counseling. At present, he is not involved in any services. CT Page 13454
What is clear is that Arthur has been involved together with Robin in the daily care of the boys when in the home. Unfortunately, he has been unable to modify his behavior to refrain from using corporal punishment to manage the boys. As found by Dr. Randall, he has some significant personal difficulties in impulse and emotional control which make it unlikely that there will be any beneficial change in his ability to care for the children appropriately in the future. The court finds, from the clear and convincing evidence that Arthur has not been able to improve his parenting abilities to the point where he could safely, together with Robin, care for his two sons.
3. The children, Edward and David L.
Edward is now ten years old and David is nine. The two boys have been in and out of foster care for four years. They are in separate foster homes at the present time. Edward continues to have significant speech difficulties and remains cognitively limited. He is in a therapeutic foster home in Massachusetts, where he has been since September, 1999. His foster parents are prepared to provide for Eddie and are considering adopting him, should he become available for adoption. Eddie, according to his present social worker, appears to feel secure and comfortable in this home. He is the oldest of the children in the home and revels in his role as the "big brother". He is proud of being able to help with the other children and enjoys doing his chores.
Eddie's foster mother testified about her family and Eddie. She reported that he is "doing ok" in school. At first he was in a school for children with behavior problems but now he is in a special education class in a regular school. He receives both physical and speech therapy. His foster mother is in constant contact with the school so that she can focus on the behavioral difficulties he has. She noted that his behavior has improved a great deal since he was first placed in her home. When he first arrived, he yelled a lot, threw things and tried to bite the other children in the home. He continues to act out in this way after visitation with his parents, she reported. However, after three or four hours of acting up, he will say that he is sorry and then pick up where he left off, as though nothing had happened.
Robin also testified at trial and reported that she and Arthur enjoy their visits with Eddie. Robin stated that every time she sees Eddie, he asks to come home. She believes that he should be returned to her care, where she feels he belongs. The visits with Eddie were continuing on a regular basis at the time of trial.
David's situation is different from Eddie's. While David suffers from CT Page 13455 some emotional problems, he does not share his older brother's cognitive limitations. His foster mother testified that David must be occupied at all times. He has chores to do around the house and when he comes home from school each day, he is required to sit down and do his homework before anything else takes place. David is presently in a contained classroom because of his impulsivity and distractibility. She reported that there is talk about moving him into a regular classroom as he has improved. She reports that he is one of the members of her family and there are five other children there as well as one additional child for brief respite care.
David has been placed with this family twice. The first time he came was in July of 1998. He left to return to his parents for the most recent reunification attempt and then he was returned to this foster home on September 9, 1999. When he first came to stay in 1998, his foster mother testified that he was an easy going and loving little boy. There were some outbursts but most of the time he seemed happy. The second time around he was a very different little boy. There have been many angry outbursts, he was very belligerent and would hit out at the others in the home. He would plant himself in a spot and refuse to move. She reported that she had to go to the school periodically to help settle him as he did not know how to control his behavior. He requires a lot of structure, she noted, and has been seeing a therapist, Dr. Michael Pines.
Dr. Pines also testified concerning David and his present situation. Dr. Pines believes that termination of parental rights was in David's best interest and that the placement with his present foster family has provided this child with safety and security. He noted that David had significant tantrums in the past, he demonstrated highly impulsive behavior, oppositional and defiant behavior and showed disorganized thinking. The child would "resist to any limits or structure placed on him through oppositionality, threats of aggression and bouts of negativism." At the present time, he noted that "David's mood was better" and that the child himself described himself as happier. He noted that he continues to demonstrate issues of loyalty to his parents and to be conflicted about his future. He will continue to need counseling in the future as he:
 needs to move away from his feelings of self-blame for the problems his parents have encountered. He sees himself as a damaged or flawed child. At times, he is angry with his parents because they could not care for him. At times he says he is not the easiest child to care for, alternately excusing them and blaming himself or the other way around. CT Page 13456
At Dr. Pines' suggestion, visitation between David and his parents was stopped as the child had great difficulty in dealing with such visitation. Dr. Pines noted that he knew that several reunification attempts had failed. He stated that "there is a point at which repeated exposure to those problems place impairments on David." He stated: "We know from research that one way in which children are able to process disruptive attachments is to be placed in a stable and secure setting with trusting and secure relationships. David, "he noted, "had not had such an experience outside his present foster home."
 B. ADJUDICATORY FINDINGS 1. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent," Connecticut General Statutes § 17a-112 (c)(1). The court has listed the many services provided to these parents and the repeated attempts to permit them to demonstrate that they had learned a sufficient amount to be able to care for their children. The court finds, from the clear and convincing evidence, that more than reasonable reunification efforts were made for this family and neither Robin nor Arthur was able to care for their children appropriately.
2. Adjudicatory findings
 (a) Robin T.
Both children were adjudicated neglected and committed to the care and custody of DCF for a period of twelve months on January 10, 1997. Their commitment has been extended on several dates since that time. The court further finds, by clear and convincing evidence, that as of February 18, 2000, Robin had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, she could assume a responsible position in their lives. Connecticut General Statutes § 17a-112 (c)(3)(B), now subsection (j)(3)(B). Even at the time of trial, Robin was unable to acknowledge her contribution to her children's problems and perceived only the "injuries" that DCF has inflicted on her family.
"`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532
(1986), see also; In re Juvenile Appeal, 1 Conn. App. 463, 477, CT Page 13457473 A.2d 795 (1984). The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 1167,554 A.2d 722 (1989), In re Hector L., 53 Conn. App. 359, 366-367, ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Robin's conduct prior to the filing of the petitions, but also her conduct after that time. The court concludes Robin T.'s lack of rehabilitation must be seen from the perspective of these children, as she was not able to manage their behaviors and to take steps to keep them safe, despite the repeated reunification attempts. They both have needs to be in a stable and secure home setting, which she has been repeatedly unable to provide, much to their detriment. She shows no evidence of being able to provide such security now, at the time of trial, some nine months after the commencement of the termination proceedings
The evidence has shown that David has had a hard time with the repeated reunification attempts. He needs to let go of the conflict he has about these issues. Edward, too, has benefited from the careful structure and nurturing his foster home has provided. Robin, unfortunately, has not learned how to provide such care for her children. How long a period of time needs to elapse before Robin could do this is unknown. She has already attempted to do this for a period in excess of three years. This has consumed three childhood years of her boys. They need to move on emotionally and cannot wait any longer. They have good relationships with their foster parents, who are able to care for them.
(b) Arthur L.
The same ground is alleged against the children's father. As to his failure to rehabilitate so that he could care for the children, the court finds from the clear and convincing evidence that Arthur has not rehabilitated. He was not able to refrain from physical discipline of the children during each reunification attempt. He is not able to improve his situation so that he would be able to care for them in the reasonable foreseeable future.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (k):
1) Appropriate and timely services were provided by DCF to the family. The services include many services for both Robin and Arthur about CT Page 13458 parenting, individual and couples counseling, as well as behavioral management counseling. DCF also provided visitation and case management services.
2) As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for both parents, who were not able to fulfill them. While Robin made more attempts than Arthur, ultimately the learning and changed behavior that are the desired outcomes of the programs were not demonstrated by either of the parents.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. In this case, the record is clear that Eddie and David have good close relationships with their foster parents. David has a conflicted relationship with his parents and Eddie shows negative consequences after his visitation with his parents.
5) Finding regarding the ages of the children. Eddie is ten years old and David is nine.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. As detailed above, the court finds that neither parent has made adequate changes to accommodate the care and nurturing of these children. While both remain interested in their children, that interest had not motivated either parent to make the considerable personal changes required to be able to care for their children, despite the repeated opportunities that they have been given.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person or by the economic circumstances of CT Page 13459 the parent. No such conduct is noted. DCF has taken many steps to encourage these parents to have meaningful relationships with their children, which they have been unable to accomplish within a reasonable period of time, given these children's ages and needs.
 D. DISPOSITION The Best Interests of the Children.
In hearing a termination of parental rights case, the court must first determine whether or not the grounds for termination have been proven by clear and convincing evidence. If so, only then may it consider what action is in the best interests of the children at issue. As has been noted:
 A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child. (Citations omitted; internal quotation marks omitted.) In re Danuael D., 51 Conn. App. 829, 835-37, 724 A.2d 546
(1999).
The court has found that the adjudicatory grounds for termination of the parental rights of the biological parents of the children have been proven by clear and convincing evidence. The court has made the seven statutory findings required, which all weigh in favor of termination being in these children's best interests. The court concludes, from the clear and convincing evidence that these children cannot wait any longer for permanency. Despite their chaotic early years while in the care of their parents and their earlier difficult foster care placements, they have now reached a safe haven. The experts are unanimous that the children have done well with their present foster parents, who have the personal characteristics to be able to provide for these special needs children.
Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD),189 Conn. 276, 455 A.2d 1313 (1983). In addition, "[b]ecause of the psychological effects of prolonged termination proceedings on young CT Page 13460 children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992). David clearly views his foster parents as those individuals who are able to provide for him emotionally. Eddie's foster parents are able to care for him well and he has thrived there. The court concludes, from the clear and convincing evidence, that it is in the best interests of these two children to have permanency and stability in their lives. Towards that end, the court concludes that it is in Edward and David's best interests that their parents' rights to them be terminated.
The court therefore orders that a termination of parental rights enter with respect to Robin T. and Edward L. The foster parents have expressed an interest in adopting Edward and David and the court directs that they be given first consideration in any adoption. The court further orders that a permanency plan for Edward and David be submitted, as well as a review plan for them in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session