## IN RE DANUAEL D.*
### (AC 17185)

Landau, Schaller and Dupont, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued November 5, 1998—officially released February 16, 1999

*Audrey C. Martinsky*, for the appellant (respondent mother).

*Patricia E. Naktenis*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Opinion*

LANDAU, J. The respondent mother appeals from the judgment of the trial court terminating her parental rights to her child, Danuael D. On appeal, the respondent mother claims that the trial court improperly found that (1) she failed to achieve personal rehabilitation and (2) she denied Danuael D., by reason of an act of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being.[1] We affirm the judgment of the trial court.

---

[1] In addition, the respondent also claimed that the trial court improperly found that the termination of the respondent's parental rights was in the

On February 8, 1996, the department of children and families (DCF) filed a petition to terminate the parental rights of the respondents[2] to their five year old child, Danuael D., pursuant to General Statutes (Rev. to 1995) § 17a-112, as amended by Public Acts 1995, No. 95-238, § 3 (effective October 1, 1995).[3] The termination petition

best interest of the child. The respondent, however, cites no law in support and provides no analysis of that claim. We therefore decline to review that claim as it is deemed to be abandoned. See *New London Federal Savings Bank* v. *Tucciarone*, 48 Conn. App. 89, 101, 709 A.2d 14 (1998).

[2] The parental rights of the respondent father were also terminated with respect to Danuael D. The father, however, has not appealed from the trial court's judgment. We refer in this opinion to the respondent mother as the respondent.

[3] At the time the termination petition was filed, the statute in effect was General Statutes (Rev. to 1995) § 17a-112, as amended by Public Acts 1995, No. 95-238, § 3 (effective October 1, 1995), which provides in relevant part: "(a) In respect to any child committed to the commissioner of children and families in accordance with section 46b-129, either the commissioner, or the attorney who represented such child in the prior commitment proceeding, or an attorney appointed by the superior court on its own motion, or an attorney retained by such child after attaining the age of fourteen may petition the court for the termination of parental rights with reference to such child . . . .

"(b) The superior court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition if it finds that the Department of Children and Families has made reasonable efforts to reunify the child with the parent and, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to any nonconsenting parent, over an extended period of time, which . . . shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; or (3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met

alleged three adjudicatory grounds with respect to the respondent: (1) failure to achieve rehabilitation,[4] (2) the child was denied, by reason of acts of commission or omission by the respondent, the care, guidance or control necessary for his physical, educational, moral or emotional well-being,[5] and (3) there was no ongoing parent-child relationship with respect to the respondent and the child.[6] The trial on the petition concluded on December 18, 1996, and on April 2, 1997, the trial court rendered judgment, finding that DCF had established by clear and convincing evidence the adjudicatory grounds of failure to achieve rehabilitation and acts resulting in the denial to her son of the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Furthermore, the trial court, in the dispositional phase, found by clear and convincing evidence that it was in Danuael's best interest that the parental rights of the respondent be terminated. This appeal followed.

In a comprehensive memorandum of decision, the trial court set forth the following facts. "Danuael was born on October 29, 1990, the third out of wedlock child born to his then twenty-four year old mildly retarded mother. None of the children share a common paternity. By her own admission, [the respondent] had used drugs during her first two pregnancies (marijuana with [M]; cocaine with [Z]). [Z]'s father . . . was abusive toward

on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. . . ."

Any references in this opinion to the statutory revision to 1995 indicate that those sections were not affected by Public Acts 1995, No. 95-238.

[4] General Statutes (Rev. to 1995) § 17a-112 (b) (2), now § 17a-112 (c) (3) (B). See footnote 3.

[5] General Statutes (Rev. to 1995) § 17a-112 (b) (3), now § 17a-112 (c) (3) (C). See footnote 3.

[6] General Statutes (Rev. to 1995) § 17a-112 (b) (4), now § 17a-112 (c) (3) (D). See footnote 3.

[M] as well as toward [the respondent]. . . . [I]n late 1989, [the respondent] began living with [the respondent father, L], becoming pregnant with Danuael at the same time that [M] and [Z] were taken into DCF custody following confirmation of physical abuse of both children (multiple unexplained fractures of differing ages; bruises; burns) that was presumably inflicted by [L] and from which [the respondent] appeared incapable of providing protection. . . . Following a trial, these two children were adjudicated neglected and abused and committed to DCF. . . .

"When Danuael was [approximately] nine months old, DCF . . . filed a petition alleging Danuael to have been neglected by reason of two episodes of physical abuse by [L] (a slapped face in May of 1991; a plastic ball thrown at his face, causing a bruise, two months later). . . . [T]he respondent [and L] moved to dismiss for failure to have established a prima facie case of neglect, as of the adjudicatory date of July 26, 1991. The motion was granted. . . .

"[At some point thereafter, L] was incarcerated for ten months . . . . Upon his release, despite the permanent loss of her two older children because of abuse by [L], [the respondent] resumed her relationship with him. At one time during this period, [the respondent] moved to New Haven in an effort to be free of his mistreatment of her, but, soon after, returned to Bridgeport to resume cohabiting with him . . . .

"[The respondent] and [L] and their son, Danuael, were living with [L]'s father when the police were called on April 8, 1994, in response to a report of domestic violence. . . . [B]oth parents were found to be under the influence of one or more substances, and were required to leave the paternal grandfather's home. . . . [The respondent] had no place to go, so the child was placed on an emergency basis with DCF, which soon

after filed a neglect petition and secured an order of temporary custody. . . .[7]

"In his first three months as a foster child, Danuael had as many placements: First he was placed with the maternal great-aunt . . . [but] [a]fter seven weeks the aunt asked for his removal because of his uncontrollable behavior: enuresis [incontinence of urine], encopresis [involuntary defecation], smearing feces, swearing, and overtly sexualized acting out. Two subsequent unrelated foster homes requested his removal in a matter of days. An inpatient assessment at the Hospital of St. Raphael in July, 1994, resulted in a diagnosis that this behavior was a response to extreme, severe psychosocial stressors: Witness to domestic violence against his mother, abuse of his siblings and the subsequent incarceration of his father. In the months following, DCF attempted to follow the hospital's recommendation to secure a therapeutic foster home combined with outpatient services. Two therapeutic foster homes were found, but both requested his removal because of his continued disturbed behaviors. After another inpatient psychiatric hospitalization, he was finally placed at Riverview Hospital on October 20, 1995, where he has remained through the conclusion of this trial. . . . [Danuael's] principal diagnosis is posttraumatic stress syndrome resulting from the significant trauma experienced when living with his parents, much of which could have occurred even before he became verbal.

"After [L]'s incarceration, [the respondent] became involved with at least one other abusive boyfriend [S]. In testifying on her own behalf, she denied that [S] was a 'boyfriend,' although at one time she had arranged for her Social Security benefits to be paid to him as

---

[7] Shortly thereafter, in May of 1994, L was arrested for the stabbing death of an unrelated ten year old girl. L was subsequently convicted and sentenced to a term of sixty years without parole.

representative payee. [The respondent] admitted that [S] had beaten her, but said this had only happened once, in [October] of 1995, after which she broke up with him. She did not explain the source of the visible injuries on her face noted by Danuael's clinicians during visits of March and April of 1996."

The clinical assessment portion of the memorandum of decision indicates that the respondent "came to visit the first month Danuael was placed at Riverview but was not permitted to see him [because] she was exhibiting extensive bruises from a recent beating at the hands of [S]. [The respondent] appeared unable to understand why she could not see him in that condition. The following month she was permitted to visit even though her face still showed scars which upset her 'parentified' son.[8] In apparent ignorance or indifference to his fear of bathrooms . . . [the respondent] took Danuael, during that first visit, into the bathroom and closed the door. Following that visit, the child had nightmares, displayed anxiety, acted out of control and reenacted past trauma using a guttural voice to utter adult swearing with sexual references. Despite appearing on two other visits with visible signs of having been abused (a burn in March of 1996; a bleeding cut the following month), [the respondent] was permitted to visit every month until October of 1996 when all visits were suspended during a planned transition into another therapeutic foster home."

"The standard for review on appeal [from a termination of parental rights] is whether the challenged findings are clearly erroneous. *In re Luis C.*, [210 Conn. 157, 166, 554 A.2d 722 (1989)]; *In re Christina V.*, 38

---

[8] Cathleen Sawyer, Danuael's primary clinician and staff member at Riverview Hospital, testified that "parentified" means "that the child . . . is more worried about taking care of the parent, than expecting the parent to come in and take care of him."

Conn. App. 214, 223, 660 A.2d 863 (1995). The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980). *In re Juvenile Appeal (84-3)*, 1 Conn. App. 463, 478, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). *In re Luis C.*, supra, 166.

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. *In re Michael M.*, [29 Conn. App. 112, 121, 614 A.2d 832 (1992)]; *In re Megan M.*, 24 Conn. App. 338, 342, 588 A.2d 239 (1991); *In re Davon M.*, 16 Conn. App. 693, 696, 548 A.2d 1350 (1988). We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached; *Pandolphe's Auto Parts, Inc.* v. *Manchester*, [supra, 181 Conn. 222]; nor do we retry the case or pass upon the credibility of the witnesses. *In re Christine F.*, 6 Conn. App. 360, 366–67, 505 A.2d 734, cert. denied, 199 Conn. 808, 809, 508 A.2d 769, 770 (1986). Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. *State* v. *Jones*, 205 Conn. 638, 660, 534 A.2d 1199 (1987). *In re Kezia M.*, 33 Conn. App. 12, [17], 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993); *In re Felicia D.*, 35 Conn. App. 490, 499, 646 A.2d 862, cert. denied, 231 Conn. 931, 649 A.2d 253 (1994). . . . *In re Eden F.*, 48 Conn. App. 290, 309, 710 A.2d 771, cert. granted on other grounds, 245 Conn. 917, 717 A.2d 234 (1998).

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. *In re Tabitha P.*, 39 Conn. App. 353, 360, 664 A.2d 1168 (1995). In the adjudicatory phase, the trial court determines whether one of the statutory grounds for

termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Roshawn R.*, 51 Conn. App. 44, 51–52, 720 A.2d 1112 (1998).

The respondent first claims that the trial court improperly found that she had failed to achieve rehabilitation as to Danuael. We are not persuaded.

In regard to the failure to achieve rehabilitation, General Statutes (Rev. to 1995) § 17a-112 (b) (2) provides for the termination of parental rights when "the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, *considering the age and needs of the child,* such parent could assume a responsible position in the life of the child . . . ." (Emphasis added.) See General Statutes (Rev. to 1997) § 17a-112 (c) (3) (B). " 'Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. *In re Migdalia M.*, 6 Conn. App. 194, 203, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986). Our Supreme Court has held that § [17a-112] (b) (2) [now § 17a-112 (c) (3) (B)] requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. *In re Luis C.*, [supra, 210 Conn. 167]. *In re Michael M.*, supra, 29 Conn. App. 124. A determination by the trial court under § [17a-112] (b) (2) [now § 17a-112 (c) (3) (B)] that the evidence is clear and convincing that the parent has not rehabilitated herself will be disturbed only if

that finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous." (Internal quotation marks omitted.) *In re Felicia D.*, 35 Conn. App. 490, 500, 646 A.2d 862, cert. denied, 231 Conn. 931, 649 A.2d 253 (1994).

The essence of the respondent's argument that the trial court's findings are clearly erroneous is based on a challenge to the testimony of various witnesses. The respondent challenges the credibility of Mary Corcoran, a DCF social worker, Sawyer, and Carol Swenson, a psychologist. In addition, the respondent questions the fact that the trial court chose to believe one segment of the testimony of another witness and not another part. Essentially, the respondent does not claim that there is insufficient evidence in the record for the trial court's findings, but claims, instead, that she would prefer that this court rely solely on specified portions of evidence and her interpretation of that evidence. It is axiomatic that the trial court, as trier of fact, is in the best position to judge the credibility of witnesses. We, therefore, find that the respondent's claim is without merit.

In August, 1994, the respondent agreed to comply with the court's expectations in order to improve her chances of regaining permanent custody of Danuael. These expectations included weekly visitation with Danuael, participating in parenting, drug and alcohol and other counseling, securing and maintaining adequate housing and income, refraining from substance abuse and cooperating with the department of mental retardation (DMR). The respondent claims that she met the expectations and that, therefore, the record does not support the trial court's finding that she did not achieve rehabilitation.

The trial court found that in the two years between the time that Danuael was removed from his home and

the adjudicatory date of the petition, the respondent made minimal gains in her ability to care for herself and none in her ability to meet the specialized needs of Danuael. The trial court noted that "[a]ll of the claimed improvements in her situation—elimination of relationships with abusive men, sustained sobriety, improved cooperation with assistance offered by DMR, the securing of her own apartment rather than living off the largesse of others—post-date the adjudicatory date of this petition . . . ." The record discloses that the father of the respondent's second child was abusive to her and the children. In her next relationship, although the respondent was aware that Danuael's father had abused the two older children, she resumed her relationship with him. In 1995, despite her prior relationships with abusive men, the respondent became involved with another abusive male, S, to the extent that she arranged for him to receive her social security benefits as her representative payee. Although the respondent testified that she separated from S after the assault in October, 1995, and that she had not become involved with any other men, Sawyer observed bruises on the respondent in March and April, 1996, during visits with Danuael.

Testimony at trial disclosed that the respondent did not complete a substance abuse assessment prior to the adjudicatory date. While the respondent did attend a five day alcohol treatment program early in 1994, Swenson, in a report dated July, 1994, recommended that the respondent have further treatment. Furthermore, in a report dated June, 1996, Swenson noted that the respondent admitted to a history of alcohol abuse, had a propensity toward repeated alcohol abuse and had only brief periods of abstinence.

Testimony at trial also disclosed that although the respondent's attendance improved with DMR, she was not able to incorporate what she was taught in the various services that she received so as to be able to

manage her daily affairs. Specifically, at the time of trial, the respondent still needed a conservator to help her with her budget and assistance with transportation. In addition, testimony revealed that, as of the adjudicatory date, the respondent had secured an efficiency apartment, consisting solely of a bathroom and a kitchen.

We are aware that, in assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue. See *In re Christina V.*, supra, 38 Conn. App. 220–21. In assessing the respondent's efforts at rehabilitation the question presented to the trial court was whether the respondent would be able effectively to parent Danuael, a child of particular demanding needs, not just the general needs any child has, and, further, whether such rehabilitation would be foreseeable "within a reasonable time." (Internal quotation marks omitted.) *In re Luis C.*, supra, 210 Conn 167. Furthermore, "[c]ourts are entitled to give great weight to professionals in parental termination cases." *In re Christina V.*, supra, 221.

In the present case, in the seven years between the time that the respondent lost custody of her two older children and the time of trial, the respondent appears to have made little progress in addressing her problems. The trial court found that the respondent failed to achieve a certain degree of personal rehabilitation that could support the belief that she could assume a responsible position in Danuael's life within a reasonable time, considering the age and needs of this particular child. Testimony presented at trial clearly establishes the inability of the respondent to care for the child. Specifically, Sawyer, who qualified as an expert witness, testified that Danuael was the only child with posttraumatic stress disorder this severe that she has had as a patient.

Sawyer also testified that the cause of Danuael's psychological illness was that he experienced and observed physical abuse and was possibly subjected to sexual abuse. Testimony further revealed that Danuael, in reaction to visits by his mother, yelled, had temper tantrums, was out of control and exhibited avoidant behavior by frequent trips to the bathroom or the kitchen. Testimony from Sawyer revealed that because in October, 1995, the respondent appeared for a visit with visible injuries, suggesting she had been beaten, Sawyer prohibited the visit because it would have been traumatic for Danuael to see her. In apparent disregard to the trauma that the sight of his injured mother might cause Danuael, the respondent again visited Danuael with visible bruises in March and April, 1996. Sawyer also testified that after the visits, Danuael occasionally required "locked [seclusion], [had] nightmares, [and exhibited] behavioral discontrol." In her 1996 evaluation report, Swenson concluded that the respondent "demonstrated extremely poor parenting skills and poor ability to engage in a loving and supportive way with Danuael." Moreover, the respondent confirmed the fact that she does not understand Danuael's psychological illness.[9]

The record, therefore, demonstrates that the respondent has made minimal progress in developing her own independent living skills or in her ability to care for a child with specialized needs. We recognize that some

---

[9] During the termination proceedings, the respondent was asked if she understood Danuael's problems: oppositional disorder, posttraumatic stress disorder and highly sexualized behavior. The respondent replied, "Oh, I don't know about that yet . . . but I'll find out"; "Not yet"; and "No, I don't know what it means. I don't want to say it. . . . I don't understand it yet. Not yet." The respondent, in response to a question regarding what she was planning to do to find out about the illnesses, stated, "I don't have a plan yet, but I'm thinking of a plan to find out what it is, because it's more important." The respondent, however, could not specifically state what the plan entailed other than that it was her intention to read about the illnesses at a library.

of the facts relied on by the trial court in granting the termination petition cannot be attributed to the respondent's lack of moral responsibility or commitment. "Under § 17-43a [now § 17a-112], however, the trial court's obligation is not to make an unguided investigation of the respondent's fault in determining whether to grant a petition to terminate parental rights, any more than its disposition is intended to reflect some kind of moral judgment respecting a parent whose rights are terminated. Nor may this court invalidate the statutory criteria of § 17-43a [now § 17a-112] merely because that criteria may in some instances implement the legislature's judgment that parental rights should be terminated despite the fact that a particular parent, with the best intentions, personally may be incapable of overcoming deficiencies in parenting skills. This court has [insisted] upon strict compliance with the statutory criteria [of § 17-43a, now § 17a-112] before termination of parental rights and subsequent adoption proceedings can occur . . . . *In re Juvenile Appeal (84-BC)*, 194 Conn. 252, 257 n.9, 479 A.2d 1204 (1984). Insistence upon strict compliance with the statutory criteria . . . enhances the child's best interests by promoting autonomous families and by reducing the dangers of arbitrary and biased decisions amounting to state intrusion disguised under the rubric of the child's best interests. *In re Juvenile Appeal (Anonymous)*, [177 Conn. 648, 672, 420 A.2d 875 (1979)]." (Internal quotation marks omitted.) *In re Luis C.*, supra, 210 Conn. 168–69.

In the present case, the trial court considered General Statutes (Rev. to 1995) § 17a-112 (b) and (d),[10] as

[10] General Statutes (Rev. to 1995) § 17a-112 (d), as amended by Public Acts 1995, No. 95-238, § 3 (effective October 1, 1995), provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to

amended by Public Acts 1995, No. 95-238. To terminate parental rights for failure to achieve rehabilitation, both prongs of the test incorporated in § 17a-112 (b) must be met: one, that the parent has failed to achieve rehabilitation and two, that there is no reason to believe that the parent could assume a responsible position in the life of the child within a reasonable time, *considering the age and needs of the child*. We have reviewed the record together with the transcript, exhibits and briefs in this case, and we are unable to conclude that the trial court improperly analyzed the respondent's rehabilitative needs with respect to the needs of Danuael and that its findings as set out in its memorandum of decision are clearly erroneous. Therefore, we will not disturb the trial court's findings.[11]

The judgment is affirmed.

In this opinion the other judges concurred.

facilitate the reunion of the child with the parent; (2) whether the department of children and families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[11] As was conceded at argument, we note that given the resolution of this claim we need not address the respondent's remaining claim.