Adjudicatory Decision
This case is a petition brought by the Commissioner of the Department of Children and Families (DCF) to terminate the parental rights of Ms. Rosa R. and Mr. Craig F., who are the biological parents of two minor children, eight-year-old Axavian (born September 23, 1992) and six-year-old Tiffany (born March 1, 1994). The court finds that both parents were served with the petitions and have appeared through counsel. There are no other actions pending regarding custody of these children.
The court heard evidence in this case on September 11 through 13, 2000. On November 13, 2000, counsel for the minor child moved to re-open the trial and permit additional evidence as to the current status, placement and best interests of the children. After argument on that motion on December 21, 2000, the court granted the motion; bifurcated this trial into separate adjudicatory and disposition phases; notified the parties that it had determined that the petitioner had proven the adjudicatory grounds as to each parent by clear and convincing evidence and would issue a written memorandum to that effect shortly; and re-opened the evidence as to disposition. For the reasons stated below, the court finds that the petitioner has proven, by clear and convincing evidence, the adjudicatory grounds pleaded in the petition as to each respondent parent.
 I — Factual Background
On June 14, 1995, DCF filed neglect petitions alleging that Axavian and Tiffany were neglected and had been abandoned in that they had been denied proper care and attention and permitted to live under conditions, circumstances or associations injurious to their well-being. An affidavit of a DCF social worker attached to the neglect petition averred that Ms. CT Page 16035 R. had alcohol and substance abuse problems and had not complied with promises she had made to seek and complete substance abuse treatment and that the respondent father, Mr. F. was incarcerated in New York State. One month later, on July 21, 1995, the court adjudicated the children neglected and committed them to the care and custody of DCF for a period of eighteen months. The court also adopted specific Expectations ordering, inter alia. Ms. R. to undergo a drug/alcohol evaluation and follow its recommendations. (Petitioner's Exhibit 2.) On November 27, 1996, the court granted the Commissioner's petition to revoke the commitment and return the children to Ms. R. as she "has cooperated with the Department . . . and has successfully completed drug treatment." The court approved an order of protective supervision for three months, which the court later extended until May 31, 1997.
On April 14, 1997, DCF filed a second neglect petition and also sought an order of temporary custody alleging that Axavian and Tiffany were in immediate danger from their surroundings. An affidavit of a DCF social worker attached to the neglect petition stated that:
 • The Department had received an anonymous complaint of a domestic incident in which Ms. R. had been intoxicated;
 • Ms. R.'s oldest son had reported to a DCF worker investigating the anonymous complaint that his mother had a bad drinking problem and that the son had found hypodermic needles in the bathroom;
 • After ascertaining that Ms. R had not followed up on substance abuse treatment recommendations, a DCF worker had gone to Ms. R.'s home, detected a strong odor of alcohol on her breath, and found her children living in unkempt surroundings with inappropriate sleeping arrangements; and
 • The children's biological father remained incarcerated in New York.
On May 13, 1997, Ms. R. entered into a "service agreement" with the Department in which she agreed to attend an appointment at the Morris Foundation for a drug and alcohol assessment and to have a random urine and breathalyser screen testing done. (Petitioner's Exhibit 1.) Thereafter, on July 9, 1997, the court again adjudicated the children to be neglected and transferred custody and guardianship of them to the maternal grandmother. CT Page 16036
On April 15, 1998, the Department once again filed a neglect petition and sought an order of temporary custody of the children. Documents accompanying the petition stated that two days earlier, on April 13, 1998, the maternal grandmother had brought the children to DCF and reported "she was unable to manage the children anymore." (Statement of Facts Substantiating Allegations of Neglect/Uncared For, attached to Petition of 4/15/98.) At a court hearing on April 22, 1998, the court (Holden, J.) sustained the OTC with the consent of the respondent mother. The court docket sheet also reflects that Ms. R. reported to the court that Mr. F. was identified as the biological father on the birth certificates of Axavian and Tiffany and the court determined him to be their legal father. Counsel for the father represented to the court that Mr. F. remained incarcerated in New York.
On April 22 and then again on May 18, 1998, the court (Holden, J.) entered following specific steps and expectations to facilitate return of the children to Ms. R. among which were the following:
• Visit the children as often as DCF permits;
 • Participate in parenting, individual, and drug and alcohol counseling;
 • Undergo a drug and alcohol assessment and follow any resulting treatment recommendations;
• Secure and maintain adequate housing and income;
• No substance abuse
• No involvement with the criminal justice system.
(Petitioner's Exhibits 2 and 4.)
Thereafter, on July 26, 1999, the Commissioner filed petitions to terminate the respondents' parental rights. As grounds to terminate the parental rights of the respondent mother, Ms. Rosa R., the petition alleged that each child
 has been found in a prior proceeding to have been neglected or uncared for and the mother . . . has . . . failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child/youth, he/she/they could assume a responsible position in the life of the child/youth
CT Page 16037
The petition alleged that the respondent father. Mr. Craig F., had abandoned his two children.
 II — Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilliness to benefit from reunification efforts." General Statutes § 17a-112
(c)(1).[2] "[R]easonable efforts means doing everything reasonable, not everything possible . . . ." In re Tabitha T., 51 Conn. App. 595, 600,722 A.2d 1232 (1999); In re Antonio M., 56 Conn. App. 534 (2000). "[R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case." (Internal quotation marks omitted.) In re Hector L., 53 Conn. App. 359, 372, 730 A.2d 106 (1999).
A. Reunification efforts with the mother
In this case, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify Ms. R. with her children. DCF offered a number of services aimed at reunification, including supervised visitation, psychological evaluation and counseling, drug and alcohol evaluation and treatment, and various other social worker services on a timely and appropriate basis. Axavian and Tiffany were removed from Ms. R's custody primarily because of Ms. R.'s drug and alcohol abuse. The Department referred her repeatedly for evaluation and treatment of her drug and alcohol problems. In addition to the substance abuse problems. Ms. R. has psychological problems that interfere with her parenting. and DCF referred her for personal and family counseling to help her address her psychological problems. As Ms. R. had been homeless at one point, DCF provided case management services and referrals to housing management companies to help her find adequate housing. Because she had exposed her children to domestic violence committed on her by a male partner and had once left her young children alone without adult supervision, the court ordered her to participate in parenting classes. DCF referred her to such classes at Family Ties. To help improve her parenting skills, DCF also offered regular supervised visitations at Family Services at which she could receive feedback on how she had interacted with her. The services that DCF provided and to which the Department referred her were reasonable and appropriate to help her reunify with Axavian and Tiffany.
B. Reunification efforts with the father
CT Page 16038
The evidence establishes that the respondent father has been incarcerated since the children first went into DCF custody in 1995. He is currently in prison at the Collins Correctional Facility in Collins, New York. located near the Canadian border. Before that, at the time when he was served the neglect petition in 1997, he was incarcerated in Malone. New York. near the northern border of New York. Mr. F. has never made any attempt to contact the children or to contact the Department on their behalf except for two letters requesting the Department to consider his sister or mother as placement resources for the children. He is due to be released from prison in late 2001. At trial Mr. F. did not request or seek placement of the children with himself and stated that, if the children were not reunited with their biological mother, Ms. R., he would like them placed with his sister or grandmother.
Although the evidence does not disclose that the Department ever attempted to facilitate visitation between Mr. F. and his children, by his lack of contact with the children or the Department he never gave any indication he wanted to have such contact, even during the trial of this case. The evidence does show, moreover, that the Department did consider and was, at the time of trial continuing to pursue, his desire to place the children with his sister or mother. DCF requested that Florida, where they live, perform a study pursuant to the Interstate Compact on The Placement of Children (§ 17-185a of the Connecticut General Statutes) in order to examine the possibility of granting custody of Axavian and Tiffany to Mr. F.'s father or sister, Florida had conducted such studies and found placement with the sister not to be appropriate. While DCF had not received the official results of study of the paternal grandmother as a placement possibility by the time of trial, DCF had been informed by Florida child welfare workers that the mother's home there was not presently suitable for Axavian and Tiffany as it was too small.
On this factual record, the court finds by clear and convincing evidence both that DCF made reasonable efforts to reunify, the children with Mr. F. and that he was unable and unwilling, by virtue of his incarceration and lack of interest in or contact with the children, to benefit from such efforts.
 III — Statutory Grounds for Adjudication
Trial of a petition to terminate parental rights has two phases, adjudication and disposition. To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied. 247 Conn. 919, 722 A.2d 807 (1998); General Statutes § 17a-112
(c)(3). In the adjudicatory phase of a termination hearing, the trial CT Page 16039 court determines if one of the statutory grounds for termination of parental rights is proven by clear and convincing evidence. In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment."In re Tabitha P., 39 Conn. App. 353, 367, 664 A.2d 1168 (1995); Practice Book § 33-3(a).
The adjudicatory date in this case is February 28, 2000, the date of filing of the most recent amendment to the petition.[3] The petition alleges, as grounds for termination, abandonment by the respondent father and failure to rehabilitate by the respondent mother. The court finds that DCF has proven these grounds by clear and convincing evidence.
A. Adjudication as to the respondent mother, Ms. Rosa R.
Section 17a-112 (c)(3)(B) of the General Statutes sets forth the statutory basis upon which the Commissioner relies in its petition against the respondent mother. It provides in relevant part:
 The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . that . . . the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child.
The court must determine whether the petitioner has proven, by clear and convincing evidence. that Ms. Rosa R. had failed, as of the adjudicatory date of February 28, 2000, to achieve the required degree of personal rehabilitation.
The term "rehabilitation" as used in the statute means
 to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems.
CT Page 16040
(Internal quotations omitted; internal citations omitted) In re Eden F.,250 Conn. 674, 706, 741 A.2d 873 (1999) "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In re Danuael D.,51 Conn. App. 829, 840, 724 A.2d 546 (1999). The statutory terminology "personal rehabilitation" thus requires the court to focus on the prospect of restoring a parent "to his or her former constructive and useful role as a parent." In re Tabitha P., 39 Conn. App. 353, 361, 664 A.2d 1168
(1995). "What is a reasonable time is a factual determination that must be made on a case-by-case basis" depending on the needs and situation of the particular child. In re Shannon S., 41 Conn. Sup. 145, 154, 562 A.2d 79
aff'd, 19 Conn. App. 20, 560 A.2d 993 (1989).
In conducting the inquiry as to whether the commissioner has established a respondent's failure to rehabilitate by clear and convincing evidence, the trial court must consider:
 • the respondent's rehabilitative status as it relates to the needs of the particular child and
 • whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child. "The statute requires the court to find by clear and convincing evidence that the parent's level of rehabilitation is less than that which would encourage a belief that he or she can assume a responsible position in the child's life within a reasonable time." In re Shyliesh H., 56 Conn. App. 167, 173, 743 A.2d 165 (1999).
"Thus, the trial court's inquiry requires the determination of both the present and past status of the child, and obtaining a historical perspective of the respondent's child caring and parenting." Id.
Although the Department makes a number of claims as to how the respondent has failed to rehabilitate herself, the evidence establishes that the main problem affecting the ability of Ms. R. to be a good parent has been her use of alcohol and illegal drugs.[4] Three times DCF has had to intervene in her family because of Ms. R.'s substance abuse problems. twice removing the children from her custody (in 1995 and 1997) and once to keep the children from being returned to her care when her mother was unable to care for the children in 1998. Coupled with Ms. R.'s substance abuse problems are a cluster of psychological symptoms that the court-appointed psychologist, Dr. Julia Ramos Grenier, described as including "some depressiveness and anxiety [,] . . . poor coping CT Page 16041 mechanisms [.] . . . difficulty with anger [,] . . . stress-related physical symptoms [and] some antisocial traits [in her personality functioning]." (Petitioner's Exhibit 7; Psychological Evaluation of Rosa R., page 7.) The record reflects that on three separate occasions the court directed Ms. R. to obtain and complete treatment for her alcohol and drug abuse problems and to participate in counseling to address her psychological problems.
After sporadic efforts to seek treatment for her substance abuse problems. in mid-1999 Ms. R finally seemed to begin making a serious effort to address her substance abuse problem.[5] as of the adjudicatory date of February 28, 2000, Ms. R. had not yet successfully completed such treatment. Nor had she, by the adjudicatory date, rehabilitated herself from "the demon of addiction" to the point where it could be expected, within a reasonable period of time, that she could care for Axavian and Tiffany. Drug tests administered to her show that she continued to use illegal drugs on occasion through the end of 1999. The court finds credible the testimony of Dr. Ramos Grenier that relapses in recovery from drug or alcohol abuse are not unusual. Recovery is a life-long process, with ever a possibility of relapse. The court finds credible the additional testimony offered by Dr. Ramos Grenier that the respondent needed to demonstrate a long-term period, of at least twelve months of successful recovery, free from any use of illegal drugs or alcohol, "before she can be seen as being stable in her recovery." (Petitioner's Exhibit 7, Specific Referral Questions and Responses, page 5.) The mere two months of sobriety at the adjudicatory date do not provide any assurance of long-term recovery from drug and alcohol use.
In addition to her substance abuse problem, the evidence also disclosed a second and serious way in which Ms. R. has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her children, she could assume a responsible position in their lives. Testifying at trial, the DCF social worker said that Ms. R. could not yet take on any other role in the life of her children than as a "visiting resource" for them. Based on the evidence offered, the court finds this conclusion to be credible and well-founded.
In 1995, 1997 and 1998, the court ordered Ms. R. to visit her children as often as DCF would permit. DCF initially offered her regular supervised visitations at the Family Visitation Center. After each visitation, she would receive feedback on strengths and weaknesses in her parenting skills and interactions, based on the observation of her visit with her children. Yet Ms. R. did not make all the scheduled appointments. As a result, in February 1998 DCF switched its method of visitation to bi-weekly visits at the DCF office, which Ms. R. has CT Page 16042 attended consistently since then. These visits have been the full extent of her involvement and contact with her children during the period of their commitment. She has never sought to increase the duration or frequency of these visits. She has not sought to participate in her children's lives in other ways that DCF might permit, such as attending school functions or medical appointments with them.
The observations made by Dr. Ramos Grenier during two different parent-child interactional visits confirm that Ms. R. loves her children but is not yet ready to assume responsibility for their care. Dr. Ramos Grenier observed that Ms. R. used praise as a way of rewarding the children's behavior and the children responded to her attention in a positive manner. By the end of both interactional evaluation sessions, however, her ability to control their behavior began to wane. Dr. Ramos Grenier noted that in the first visit.
 as the evaluation progressed, the children became less cooperative with Mother, and began to show more willfulness and negative behaviors. As this happened, Mother became more and more overwhelmed by them and tended to respond negatively to their behaviors by raising her voice and chastising them verbally.
(Petitioner's Exhibit 7, Parent Child Interaction, Page 7.) In the second interactional evaluation, Ms. R. was able to control her children better but still had problems doing so:
 [T]he children became more and more physically active toward the end of the evaluation session, and Mother had to issue more commands in order to get them to stop their behavior. The children were very responsive to their mother, and interacted with her on a consistent basis. However, they tended to disregard her directions at times, and continued to rough-house with each other. Thus, their level of physical activity increased while their level of compliance decreased.
(Petitioner's Exhibit 8, Parent/Child Interaction, page 5.)
On the adjudicatory date of February 28, 2000, Axavian was 7 1/2 years old and Tiffany almost five. Axavian is now eight years old and Tiffany is 5 1/2. In considering the extent of Ms. R.'s personal rehabilitation, the court must consider her rehabilitative status by that date as it relates to the particular needs of Axavian and Tiffany — i.e., "whether she has gained the ability to care for the particular needs of CT Page 16043 the [children] at issue." In re Danziael D., supra, 51 Conn. App. 840.
Axavian and Tiffany were first removed from Ms. R.'s care in 1995. They were reunited with her for a brief period until removed again and placed in custody of their maternal grandmother from 1997 to 1998. Since then. Axavian had been in four foster placements by the time of the hearing in September 2000 and Tiffany at least one. At the December hearing on the motion to reopen, counsel for the minor child informed the court that Axavian has now been removed from his fourth foster home as well. The evidence shows that Axavian has Attention Deficit Hyperactivity Disorder (ADHD) and has exhibited behavior problems at school and in his foster homes. Defiant, aggressive, and hyperactive behavior on his part has led to his removal from his first three foster families. The court finds credible the testimony of both the DCF social worker and Dr. Ramos Grenier that, after his having been removed from his mother twice, his grandmother and three foster families, it would be extremely detrimental to Axavian to be placed again with and later removed from his mother. Dr. Ramos Grenier opined that if he were returned to his mother's care and custody now, he would probably begin to exhibit behavioral difficulties. The stress of not knowing how long he might remain in her care would exacerbate his problems. It definitely be detrimental to place him back with his mother until her recovery is stable and foreseeably certain. At the adjudicatory date, however, as noted above, Ms. R. had not yet been sober or drug-free long enough to predict future stability in her recovery, and "the possibility of relapse is still very real." (Petitioner's Exhibit 7, Specific Referral Questions and Responses, page 6.)
Thus, based on Axavian's personal problems and needs, the uncertainty of Ms.R.'s rehabilitative status, the possibility and even likelihood of relapse from her recovery from substance abuse, and the emotional problems that remain evident despite her time in counseling all meant that she was not ready as of the adjudicatory date, or in the reasonable or foreseeable future from then, to resume caring for Axavian.
Tiffany does not have any serious behavioral or psychological problems. The social worker and psychologist both described her as basically a happy, well-adjusted child. In view of her numerous removals from previous caretakers, however, the court finds credible the conclusion of Dr. Ramos Grenier that "Tiffany, who is not showing signs of serious emotional difficulties, could begin to develop these if her hopes of reunification with her mother are raised and then she is disappointed." Id. It would therefore be detrimental for her as well to be returned to the care and custody of her mother before Ms. R. is stable in her recovery. CT Page 16044
The court thus finds that the evidence supports the conclusion of Dr. Ramos Grenier that the individualized needs of the two particular children at issue here, Axavian and Tiffany. require stability and permanency now, rather than waiting to see if their mother is successful over the long-term in her drug treatment.
The court therefore finds, by clear and convincing evidence, that Ms. Rosa R. had failed, as of the adjudicatory date of February 28, 2000. to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of her two children Axavian and Tiffany.
B. Adjudication as to the respondent father, Mr. Craig F.
The Commissioner has asserted, as the statutory ground for terminating the parental rights of Mr. F., that he abandoned Axavian and Tiffany. Section 17a-112 (c) of the General Statutes provides that
 [t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . .
The court must thus determine whether the petitioner has proven, by clear and convincing evidence, that Mr. Craig F. had, as of the adjudicatory date of February 28, 2000, abandoned his minor children Axavian and Tiffany:
 Abandonment focuses on the parent's conduct . . . . A lack of interest in the child is not the sole criterion in determining abandonment . . . . General Statutes [Rev. to 1995] § 17a-112 (b)(1) [now § 17a-112 (c)(3)(A)] defines abandonment as the [failure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child . . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the CT Page 16045 child, and demonstrates no concern for the child's welfare . . . .
In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122 (1993).
The statute requires DCF to show by clear and convincing evidence that a parent has failed to maintain a reasonable degree of interest in the welfare of his or her child:
 Maintain implies a continuing, reasonable degree of concern" not "a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child." "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance . . . .
(Internal quotation marks omitted.) Id. Mr. F. has shown none of this behavior.
Applying this standard, the evidence in this case irrefutably establishes by clear and convincing evidence that Mr. R. has abandoned Axavian and Tiffany — not from the mere fact that he has been incarcerated since the initial neglect petitions. but because he has failed to maintain a reasonable degree of interest in the welfare of either child. "[T]he inevitable restraints imposed by incarceration do not in themselves excuse a failure to make use of available though limited resources for contact with a distant child." In re JuvenileAppeal, 187 Conn. 431, 443, 446 A.2d 808 (1982). The court should, for an incarcerated parent, as for any other parent alleged to have abandoned a child. consider whether the parent has made efforts to maintain contact with the child, to express love and affection for the child. to express concern regarding the well-being of the child, to provide financial assistance if possible and to furnish appropriate religious and social guidance.
Mr. F. has been completely uninvolved in the lives of Axavian and Tiffany during the pendency of the neglect or termination petitions. He had no contact at all with his children during this time. He has not visited them since 1994. He has never contacted DCF regarding their well-being, to see the children, or to have any contact with them. He has CT Page 16046 never sent them any gifts, cards, or letters either directly or through the Department since they entered foster care. He has not provided them with any financial support. The effect on the children of his non-involvement has been predictable. Neither has ever given any indication to the DCF social worker that they recognize him as their father nor even asked her about him.
Although Mr. F. testified that he would like to re-establish family ties with his children. his lack of interest in or contact with Axavian and Tiffany in the last five years belie such a stated desire. There are many ways an incarcerated parent can maintain ties with his or her children. As soldiers, sailors, and those in distant places have known and demonstrated across the centuries, letters, cards, gifts, (and, today, perhaps even telephone calls) can, even if the distance to an out-of-state prison make visits there impractical, show the children that their parent still loves them, wants to preserve a relationship with them, and provide the source of maintaining those bonds and connectedness. Mr. F. has done none of these. His only effort to maintain a bond with his children has been two letters he sent to DCF requesting that the Department consider his sister or mother living in Florida as placement resources.
"Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred . . . ." In re Drew R., 47 Conn. App. 124, 129, 702 A.2d 647 (1997). The evidence here shows, by clear and convincing evidence, just such abandonment here. Accordingly, the court finds by clear and convincing evidence that the petitioner has proven the statutory grounds of abandonment as to the respondent father, Mr. Craig F.
Having concluded the adjudicatory phase by finding that the petitioner has established the adjudicatory grounds by clear and convincing evidence, the court will defer decision on whether termination is in the best interests of Axavian or Tiffany until the parties conclude presentation of evidence in the dispositional phase. Only then will the court enter a final judgment in either petition.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT CHILD PROTECTION SESSION