MEMORANDUM OF DECISION
On January 21, 2000, the Department of Children and Families, hereafter "DCF," filed a co-terminous petition seeking to adjudicate Brea B. a neglected child and for the termination of her biological parents' rights to her. The neglect petition alleges that Brea has been abandoned, that she is being denied proper care and attention, that she is being permitted to live under conditions injurious to her well-being and that she has been abused and has had physical injuries inflicted upon her by other than accidental means. The termination petition alleges that Brea had been abandoned by her father, that Brea has been denied, by reason of an act of commission or omission on the part of both of her parents, the care, guidance and control necessary for her physical, educational, moral or emotional wellbeing. Further, the petition alleges that there is no ongoing parent-child relationship between Brea and her father. Connecticut General Statutes § 17a-112 (j)(3)(A), (C), and (D). The petition also alleges that reasonable efforts were not required to be made for either the mother or father pursuant to a court determination. The petition, as amended, alleges that the parents are unable or unwilling to benefit from reunification efforts.
The trial of the case was conducted on April 2 and 3, 2001 and was attended by Jennifer B. and her counsel. The matter was continued until May 17, 2001 for further notice to the absent putative father, Sheldon M. It was further continued until June 27, 2001 for further efforts at notice. Because of the facts found and the possibility that Sheldon M. is in the military or naval service of the United States, pursuant to the Soldiers and Sailors Civil Relief Act of 1940, 50 United States Code Appx. §§ 501 — 593, and in particular § 520 and Connecticut Practice Book § 17-21, the court again continued the matter for further notice. The court also severed the claims made by DCF against the absent putative father from the claims against Jennifer B. and therefore concluded the trial as to Jennifer on June 27, 2001. The court further granted a stay as to Sheldon M. Due to the facts found and for the reasons set forth below, the court adjudicates Brea a neglected child and grants the petition for the termination of the parental rights of Jennifer B. to Brea B.
From the evidence presented, the court finds the following facts:
 A. FACTS
CT Page 8595 1. Jennifer B., the mother
Jennifer is now thirty-two years old and Brea is her only child. Prior to the events of January 18, 2000, Jennifer and her daughter had never before been involved with DCF, as her famijy had assisted her in raising a child as a single parent. Brea was born to Jessica on April 1990 and shortly after the child's birth, Jennifer began to work for the Southern New England Telephone Company. She cared for Brea and lived with her mother. Jennifer's mother, the child's maternal grandmother, and the child's maternal great aunt, Mary, provided care for Brea when Jennifer was at work. Jennifer worked a swing shift and so at times Brea would spend the night with her great aunt, who after a while, provided from much of Brea's day-to-day care. Jennifer was closely involved in her daughter's life and after some time, she and Brea tnoved into an apartment together. While still working for the Telephone Company, Jennifer injured her back and she required surgery. During the recovery time, she returned to her mother's house, as she could not care for Brea. She also experienced considerable pain, which continued after her recovery from surgery. She was later able to get her own apartment again. By the time Brea went to the first grade, her mother provided most of her care.
Information about the life Brea led with her mother between 1996 and January, 2000 is sketchy. There is no question that between 1996 to January 18, 2000, Jennifer was an involved and active parent in Brea's school life. She volunteered at school and participated in parent activities. During this time, she left SNET to go to college and worked to support her daughter. She reinjured her back and again had surgery and a spinal fusion. After the surgery and her recovery, her pain did not abate. She became more limited in the things that she could do with Brea. In 1998, she was briefly psychiatrically hospitalized after she had an altercation with a neighbor. After her discharge, Jennifer continued with some outpatient therapy. She also saw a number of doctors for relief of her unrelenting pain and by January, 2000 was prescribed a variety of prescription medications for her condition.[2]
In the morning of January 18, 2000, Jennifer attacked her daughter with a large knife, planning to kill her. She also stabbed herself. During the incident, Jennifer stabbed Brea at least seven times. The child sustained deep puncture wounds and lost considerable blood. Brea herself, then nine years old, called 911. The tape recording of the telephone call reveals a terrified child who is aware that her mother is trying to kill her. Brea struggled with her mother and then escaped, at the urging of the police officer that responded to the 911 call, to a neighbor's house where she was rescued, and brought by ambulance to the hospital. Upon examination, Brea had a puncture wound in her back, where her mother had stabbed her CT Page 8596 first while she was still in bed and a deep shoulder wound with injury to her lung which was repaired at the hospital. There were other injuries, in particular to her hands, caused when Brea attempted to defend herself and to take the knife away from her mother. While she was hospitalized, Brea continued to express fear that her mother would come and "do it again."[3]
Jennifer and her counsel do not contest the events of January. 18, 2000. Jennifer stipulated to their occurrence. Jennifer claims that her actions on that fateful morning are not reflective of her parenting of her daughter, but were the result of a drug-induced psychosis. There is some considerable support for this position in the opinions of the court-appointed psychiatrist, who for purposes of the criminal proceedings against Jennifer, examined Jennifer six times between February 9 and August, 18, 2000 and once since that time shortly before trial in March, 2001. He concluded on October 6, 2000 that:
 "On January 18, 2000, Jennifer was suffering from a Major Depression, with Psychotic Features, and it was because of that mental disease that her thinking was so disturbed that she believed the only way to deal with her delusional thoughts was to end her daughter's and her own life."
Earlier in his report he had concluded:
 "it is my opinion, with reasonable medical probability, that on the morning of January 18, 2000, when she stabbed her daughter, Jennifer B. was in an acute psychotic state such that she was substantially incapable of appreciating the wrongfulness of her conduct or controlling her conduct within the requirements of the law."[4]
Jennifer B. was chatged after the incident with attempted murder, assault in the first degree and risk of injury to a minor.[5] She was acquitted by reason of mental disease or defect. She is presently being held at Whiting Forensic Institute, pending outcome of further legal proceedings.
2. Brea B., the minor child
Since the date of the attack, Brea has not had contact with her mother. She was first placed in a foster home, but now resides with her great-aunt Mary, who had cared for her during her first five years of life. Her great aunt Mary does not wish to adopt Brea, but wishes to care CT Page 8597 for her during her minority and beyond, if she is able.[6]
Jennifer was psychiatrically evaluated by a court-appointed psychiatrist in these juvenile matters proceedings. The psychiatrist also evaluated Brea. In his opinion, Brea was significantly traumatized by her mother's attack on her. And, Dr. Nicolov testified "she cannot feel safe in her presence." In his opinion, while he thought it would possible for Jennifer to rehabilitate within a number of years, he did not believe tbZt such rehabilitation would have any impact on how Brea perceives her mother. Further, he did not believe that it was likely that Jennifer could fully rehabilitate, given her past history. In his opinion, "Brea would never feel safe and would always question what is going to happen next if she was going to live with her mother." Because of this, he saw this event as irreversible, based on its impact on Brea and her initial symptoms. He also found that Brea had no present positive memories of her nibther. He testified that Brea did not "share any memories of positive experiences they had together and she did not spontaneously share anything they did together." He noted that if there had been "an enduring positive relationship, I would expect to see that in spite of what had happened." He spoke as did the therapist of a consistent sense of minimal attachment to the mother on Brea's part. He noted, as did Brea's therapist, that while he spoke to Brea on several occasions, every time the topic of her mother came up, Brea's affect would flatten and she would withdraw. In his opinion, the child was "scared and confused." Both he and Brea's therapist supported termination as being in Brea's best interests to provide her with permanency and a place to live in safety.
Brea has been seen by a therapist since her injury at the hands of her mother. Her therapist believed that the child was a good reporter of past events in her life in the clinical sense. She stated that the child has an unusual intellectual capacity, which is also borne about by Brea's school performance. Brea shared some memories of her life with Jennifer before the stabbing and reported a lot of anger and rages as well as bizarre behavior by her mother. When Brea first began to see the therapist she was having extreme night terrors. Talking about hZr experience was helpful to her. Her therapist believed that Brea had made a truly remarkable adjustment since being severely traumatized by her mother. She was very clear that the child does not wish to have contact with her mother because this would be too frightening to her. Her therapist believed that Brea did not harbor any ill will towards her mother. In her written report, she noted that Brea understood her mother cared for her and that:
 "her mother had `something wrong in her head . . . did not hate her because she said she was sorry . . a lot of bad terrible things have happened to us. . . . CT Page 8598 she must have felt sad . . . luckily she did not kill my cat."[7]
Her therapist also reported that Brea had minimal attachment to her mother. She noted that this seemed to be the result of two factors:
 "(1) limited contact during the first five years of her life; (2) primary memories of her mother were that of irrational rages, bizarre behaviors and physical abuse."
Her therapist stated that Brea had a trusting relationship with her great aunt, who was Brea's psychological parent. She noted that Brea repeatedly expressed "a clear sense of being loved by and safe with Aunt Mary." Her therapist believed that any contact between Brea and her mother would by, [be], "destructive to her newly acquired stability and sense of well being."[8]
The DCF social worker testified as the permanency plan for Brea. This plan is for long term foster care by her great aunt, Mary. While normally a severance of the child's legal relationship with her biological parents would result then in an adoption, in this case that is not the plan as Brea's great aunt has stated she is not prepared to adopt Brea. The court specifically approves this plan for Brea. As noZZd by the evaluator, whether she is adopted by her great aunt or simply remains permanently in her home will "make no difference in the way she takes care of Brea." He considered this in the child's best interests as "she would remain in the care of someone she knows and feels comfortable and safe with." Such a placement would also maintain "her ties and relationships with the extended family and means that she would keep her school, her circle of friends and the social supports that she had." The court finds that this plan is in Brea's best interests.
3. Sheldon M., Brea's putative father.
Brea has no acknowledged male biological parent, and while certain individuals have been identified by Jennifer as possible biological fathers, no one has ever been involved in Brea's life. One of-the individuals was excluded in a Connecticut support proceeding in 1993 and although he was again named by Jennifer in late 2000, the court found, based on the patermty report, that he was not Brea's father. Also identified as a possible biological father was Adrian T., to whom Jennifer was still legally married during the relevant time Brea was conceived. Based on a sworn statement by Jennifer that she and Adrian had no contact for months prior to the granting of the dissolution of marriage decree, the court finds that Adrian T. is not Brea's biological CT Page 8599 father. Further, the court holds that the rebuttable presumption that he was her parent due to the existing marriage was overcome.
The last individual named is Sheldon M. Notice was provided to him at his last known area of residence by publication. In addition, the court appointed counsel to locate him. Counsel, through the assistance of a private investigator, determined that there were approximately eight individuals in the entire United States with the appropriate characteristics and name. Certain of these were excluded. Jennifer testified that she did not know Jennifer's father's exact date of birth or social security number, but that she knew he was originally from New Orleans. The matter was continued to May 17, 2001 for further notice by publication and mail to the three individuals involved. The matter was further continued on June 27, 2001 for further notice and the claims against Sheldon M. severed from the claims against Jennifer B. The action was stayed as to him.
 B. NEGLECT ADJUDICATION
The neglect statutes specifically authorize coterminous neglect and termination petitions. When hearing both, the court must first determine whether or not a child has been neglected before turning to the termination petition and the legal requirements for its proof. The neglect petition alleges that the child has been denied proper care and attention by her mother, that she has been permitted to live under conditions injurious to her well-being and that she has been abused and has had physical injuries inflicted by other than accidental means. The court finds that the allegations of the neglect petition have been proven by a preponderance of the evidence. Connecticut General Statues §46b-120 et. seq.
The court notes that whoever Brea's biological father may be, he was neither her custodial caretaker nor involved in her life. The court adjudicates Brea a neglected child and commits her to the care and custody of the Commissioner of the Department of Children and Families for a period of one year until June 27, 2002.
 C. ADJUDICATORY TERMINATION FINI)INGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . ." Connecticut General Statutes CT Page 8600 § 17a-112 (j)(1). As noted, the court, after a hearing, made this finding. The petition was also amended to allege that Jennifer B. was unwilling and unable to benefit from reunification services. The court finds from the clear and convincing evidence that Jennifer B. has not done so. In Jennifer's case, she is unable to benefit as Brea cannot be reunified with her.
2. Adjudicatory findings
 Jennifer B.
The termination petitions allege that Brea has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for her "physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights". Connecticut General Statutes § 17a-112 (j)(3)(C).
Jennifer does not contest that her actions on January 18, 2000 inflicted serious physical injury on Brea. There can be no claim that. this was an accident. The court finds from the clear and convincing evidence that this ground has been proven.
 D. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (k).
1) Appropriate and timely services were provided by DCF to the family. These include services to benefit Brea. Given the nature of her acts against her daughter and her subsequent incarceration, no direct services were provided to Jennifer. DCF provided case management servioes.
2) As previously noted, the court finds by clear and convincing evidence, reasonable reunification efforts were made by DCF and that Jennifer B. was unable to benefit from them. There was also a previous court finding that further efforts at reunification were not appropriate.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Jennifer in the neglect proceedings. She remains unable to fulfill them.
4) The feelings and emotional ties of the child with respect to the CT Page 8601 parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. The court has detailed above that Brea does not have fond memories of her mother. The child does not wish to have any contact with her mother and remains fearful of her. She feels loved and supported by her great aunt who cared for her before she was five and who has now cared for her for most of the time she has been away from her mother. Brea has no knowledge of her putative biological father.
5) Finding regarding the age of the child: Brea is now eleven years old. Her birthday was on April.
6) Finding regarding efforts of Brea's mother to adjust her circumstances, conduct or conditions to make it in the best interests of the child to return her to her mother's home in the foreseeable future and (A) the extent to which her mother has maintained contact with the child as part of an effort to reunite the child, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that Jennifer is unable to adjust her circumstances, given her situation and Brea's refusal to have any contact with her. It is not in Brea's best interest to reunite with her mother.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parents. There was no evidence of such conduct and the court so finds.
 E. DISPOSITION.
In hearing a termination of parental rights cases the court must first determine whether or not the grounds for termination have been proven by clear and convincing evidence. If so, only then may it consider what action is in the best interests of the child at issue.
 "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds CT Page 8602 to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citations omitted; internal quotation marks omitted.) In re Danuael D., 51 Conn. App. 829, 835-37, 724 A.2d 546
(1999).
The court has found that the grounds alleged against Jennifer B. have been proven. The court has made the seven statutory findings required, which all weigh in favor of termination being in Brea's best interests. The court concludes, from the clear and convincing evidence that she deserves to have permanency in her great aunt's home. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD), 189 Conn. 276,455 A.2d 1313 (1983). In addition, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V., 25 Conn. App. 741, 748,596 A.2d 930 (1992). The court concludes, from the clear and convincing testimony, that it is in the best interests of Brea that her mother's rights to her be terminated.
The court therefore orders that the parental rights of Jennifer B. to her daughter Brea are hereby terminated. The court approves of the present permanency plan for Brea. The court has committed Brea to the care and custody of the Commissioner of the Department of Children and Families until June 27, 2002. She shall remain so committed until that date or further order of the court upon the conclusion of the trial pending against her putative biological father.
Barbara M. Quinn, Presiding Judge Child Protection Session