MEMORANDUM OF DECISION
This case is a petition for termination of parental rights brought by the Commissioner of the Department of Children and Families (DCF) to terminate the parental rights of Ms. Kimberly M., who is the biological mother of two minor children, 13-year-old Keisha M.[2] (born April 1987) and nine-year-old Tyrone H.[3] (born March 1991). The petition alleges that both children were found in a prior proceeding to have been neglected and that the respondent mother has failed to rehabilitate herself; and that she has abandoned both children by failing to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of her children. As trial, DCF proceeded only on ground B, failure to rehabilitate after a finding of neglect. For the reasons stated below, the court grants the petition.
The termination of parental rights trial was held before this court on September 18, 2000. The respondent mother attended the trial, represented by her court-appointed attorney. The petitioner and the minor children were represented by their respective counsel throughout the proceedings.
The parties introduced multiple documentary exhibits into evidence during the trial, including psychological reports and the social study. The petitioner called as its sole witness the DCF social worker, Lisa Higgins, whom the court recognized as an expert on child welfare without objection by the parties. The respondent herself testified in her own case. Counsel for the minor child provided thorough cross-examination of the witnesses at trial.
The court finds that the Child Protection Session of the Superior Court, Juvenile Matters division, has jurisdiction over the pending matter. No action is pending in any other court affecting custody of the child.
 I — FACTUAL FINDINGS
The court has carefully considered the verified petition, all of the evidence, including the social study and other exhibits entered into evidence, and the testimony presented, according to the standards required by law.[4] Upon such consideration, the court finds that the following facts were proven by clear and convincing evidence at trial: CT Page 784
A. Ms. KIMBERLY M, THE MOTHER
 1. EVENTS PRIOR TO THE NEGLECT ADJUDICATION IN 1997
Ms. Kimberly M., the biological mother of Keisha and Tyrone, was born on July 16, 1968, to the lawful union of Hosea S. and Thomas M. Her parents were divorced 10 years later. Her mother was re-married in 1982 to James S., who attempted to molest her a few months later. In the same year that her mother remarried, her father died of cancer; according to the social study entered into evidence,
 Ms. M. . . . had a stormy relationship with him. She attributes this to [her father] being an alcoholic. She states that although she had with a conflictual relationship with her father, his death was traumatic to her. A few days before he died, Ms. M. had a terrible fight with him and she stated to her father that she wished that he were dead.
(Pet.'s Ex. 13 at 3.) Unable to cope with her father's death, Ms. M. shortly thereafter began abusing drugs, drinking alcohol, experiencing emotional turmoil, and having difficulty functioning in school. After referral to a psychiatrist for treatment, she was diagnosed with bipolar disorder and prescribed medications. At age 14, she was raped by family friend. The drug abuse and mental illness that Ms. M. experienced in these early years have followed her ever since. Id.
After this traumatic upbringing, Ms. M. met Frazier H. during her junior year of high school, and became pregnant with their child, Keisha, who was born on April 1987. After dating Mr. Frazier H. on and off for several years, Ms. M. began seeing Tyrone H., Sr., and became pregnant with their child, Tyrone H. Jr., who was born on March 1991.
The substance abuse and mental illness that began in early adolescence continued to plague Ms. M. in the 1980s and early to mid-1990s. Although neither party introduced medical records pertaining to specific treatment during this period, in 1996 she told the Institute of Living (IOL) that she had a long history of hospitalizations (Pet. Ex. 2), which she later told Elmcrest Hospital dated back to when she was 13 years old. (Pet. Ex. 4.) She has reported, in the medical reports that were introduced into evidence, unconfirmed hospitalizations at Cedarcrest Hospital in 1988, 1989, 1991, and 1996; at Mt. Sinai that were "too many to count;" at Blue Hills, at Rivereast "a couple of times;" and at Stonehaven. Since the various hospital and medical records introduced into evidence report Ms. M. to be a poor historian of her personal life, the court does not assume these accounts of her hospitalization history to be completely CT Page 785 accurate. Yet from the statements she made to medical providers on occasions that she was presumably trying to obtain medical care for herself, the court concludes that even before DCF first removed her children, the respondent mother had a long history of hospitalizations and unsuccessful treatment for her mental illness.
The first time that DCF became involved in Ms. M.'s family was on August 31, 1993, when the children's pediatrician notified the department that Tyrone had two black eyes, blood behind his ear drums, and bruises on his arms. When Ms. M. denied knowing how the injuries had occurred, DCF closed the case, the social study noting cryptically that "the department substantiated at risk." (Pet. Ex. 14, at 4.)
The next DCF involvement was on June 18, 1996, when "a 96 hour hold was invoked . . . because Kimberly M. was in an abusive relationship with her live-in-companion, . . . was abusing drugs and not receiving treatment for her mental health condition." (Pet. Ex. 13.) DCF removed the children from their mother's care and placed them in a licensed foster home. Keisha was then 11 years old and Tyrone was 5. On June 21, 1996, DCF filed neglect petitions alleging that Keisha and Tyrone were neglected children who had been denied proper care and attention and permitted to live under conditions, circumstances or associations injurious to their well-being. An accompanying motion for order of temporary custody alleged that they were in immediate physical danger from their surroundings. An affidavit of a DCF social worker attached to the neglect petition and motion for OTC averred, in addition to the allegations of domestic violence, drug use and an untreated mental health condition, that Keisha reported she had witnessed domestic violence against the respondent, Tyrone said the boy friend had also hit him; there was no food in the house, Ms. M. left the children for days at a time; and the children were, as a consequence of all these problems, being denied proper care and attention.
On July 16, 1996, the court (McLachlan, J.) sustained the OTC by agreement of the parties. That same day, Ms. M. entered a denial to the accompanying neglect petition. The petition alleged that she had a history of confirmed prior neglect and physical abuse of her children in 1993, was refusing psychiatric services and medication for a long-term mental health condition, was believed to be using illicit drugs, had failed to keep an appointment for a substance evaluation, and that her current male partner was physically abusing both her, in front of her children, and her children.
The removal of her two children apparently motivated Ms. M. to seek assistance in dealing with her substance abuse and mental health issues. At the time of the 1996 DCF intervention, she had been participating in CT Page 786 individual therapy for four years at the Hartford Community Mental Health Center, which had prescribed 40 mg of Prozac daily. (Pet. Ex. 13 at 11.) On June 21, 1996, she went to Hartford Hospital requesting detoxification, which she told the intake worker she had never before attempted. (Per. Ex. 1.) She was referred to the Institute of Living, where she was admitted to the Addiction Recovery Service Partial Hospital Program for treatment of cocaine abuse. (Pet. Ex. 2.)
Her course of treatment at the IOL was difficult for her. As the date scheduled for the hearing on the OTC approached, her psychiatric state deteriorated. Within days after the court had sustained the OTC, she became extremely distraught. On July 22, she mentioned suicidal ideations, and said she was scared of her own impulses, was having difficulty sleeping, and felt "hopeless and helpless." (Pet Ex. 2, 7/22/96 Discharge Summary.) IOL admitted her to an inpatient psychiatric unit to stabilize her suicidality. After a three-day hospitalization there, her mood had improved, and she was no longer regarded as an imminent suicide risk. The IOL released her on July 25, 1996, referring her back to the five-day-per-week dual diagnosis partial hospitalization program. (Pet. Ex. 2, 7/25/96 Discharge Summary, at 4-5.) But she was discharged from that program on July 29, 1996, after only four days, because she missed two days and reported transportation problems getting there. Thus the program staff decided to change her level of care and admit her to an intensive outpatient program. The discharge summary reported that her condition at discharge was "unimproved as evidenced by no appreciable change in mental status and no evidence of insight regarding behavior." (Pet. Ex. 2, 7/29/96 Discharge Summary, at 2.)
Hospital records from St. Francis Hospital and Medical Center show that on October 7, 1996, she was admitted there after she had stopped her medications, begun using cocaine again, and made suicidal threats to her boyfriend. She was discharged after four days when she reported that she felt better about taking her medications and wanted to return home. (Pet. Ex. 3.)
2. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF MAY 22, 1997
On February 20, 1997, after the respondent mother failed to appear for a scheduled court hearing, the court (Teller, J.) adjudicated Keisha and Tyrone to be neglected children and continued the case for disposition until May 27, 1997, when it committed the two children to DCF for a period of twelve months. The court file reflects that Ms. M. again failed to appear for the May 27 court hearing. She also failed to attend three subsequent court hearings;
• A year later on May 12, 1998, when the court CT Page 787 extended the commitment for another twelve months;
 • On December 12, 1998, when the court granted the motion of the maternal grandmother to intervene as party shortly after DCF removed Keisha and Tyrone from her care; and
 • On April 22, 1999, when the court extended the commitment for an additional year; found that DCF had made reasonable efforts to reunify the children With Ms. M; and found that further such efforts were no longer appropriate.
Because Ms. M. did not attend any of these court proceedings, the court never entered a formal order of expectations or specific steps that she should follow to facilitate reunification with her children. Nonetheless, DCF had numerous contacts with her through monthly home visits. The DCF social worker testified that the court adopted specific steps for Ms. M. as part of the order of temporary custody. From the court's review of the file in this case, however, the court finds that no such expectations were ever ordered or signed by the court. The social study entered into evidence as petitioner's exhibit 13 stated that on March 13, 1998, DCF issued the standard child protection expectations for her,[5] but there is no evidence and nothing in the court file to reflect any judicial order adopting any such expectations or specific steps. Despite the lack of judicial order of expectations, however, the court finds that the respondent had full and fair notice, from the order of temporary custody and neglect petitions and accompanying affidavits, that the department was claiming her cocaine abuse and untreated mental condition had impaired her ability to be an adequate parent, and that addressing such problems was a prerequisite to return of her children.
Although the initial DCF referral had indicated domestic violence, there is no evidence that domestic violence has recurred as a problem. But substance abuse and mental illness have continued to plague her life. While DCF was still seeking to reunify the children with her, it referred her to numerous mental health and abuse treatment services to help her with these problems. Ms. M. never completed any of those programs. Instead, she showed a consistent pattern during this period of participating in these programs inconsistently, prematurely ending treatment, and relapsing back onto drugs.
Ms. M. has been variously diagnosed with an Axis I bipolar disorder (Pet. Ex. 4 and 7), Axis I major depression, severe, recurrent (Pet. Ex. 2 and 3), Axis I cocaine abuse (Pet. Ex. 3, 4, 5 and 7), and Axis II borderline personal disorder. (Pet. Ex. 4 and 7). On July 16, 1997, she CT Page 788 began outpatient treatment at the Intercommunity Mental Health Group (ICMHG) clinic in East Hartford. (Pet. Ex. 5.) The ICMHG clinic provided therapy and prescribed a daily medication regimen of Depakote, Prozac, and BuSpar. (Pet. Ex. 4.)
While in outpatient treatment at ICMHG, Ms. M. was hospitalized several times between September 1997 and March 1998:
 • In September 1997, she was hospitalized at Cedarcrest Hospital in Newington after saying she was going to strangle the children's caretaker. Cedarcrest referred her to Teamworks as an alternative to hospitalization. (Pet. Ex. 4, 9/22/97 Psychiatric Evaluation.) She remained at Teamworks from September 22 until October 20, 1997, when she was discharged following her fourth relapse with crack cocaine. The discharge summary stated that she was discharged without improvement due to resistance to therapy. (Pet. Ex. 4, 10/20/97 Discharge Summary.)
 • In November 1997, she was readmitted to Teamworks for intensive psychiatric treatment on November 17 and discharged for noncompliance and resistance to therapy on December 17. She was reported to have been initially compliant and motivated, but by the third week was exhibiting "some oppositional behaviors." She was discharged after positive random tests for cocaine on December 5, 11, and 17. (Pet. Ex. 4, 12/17/97 Discharge Summary.)
• In February 1998, she was admitted to the Lane Ameen unit at Elmcrest Hospital, after presenting at Manchester Memorial Hospital where she was again making homicidal threats against the babysitter. At the time of admission, she had been off her prescribed medications for several days. She remained at Lane Ameen until February 23, when she was transferred to Stonehaven for women, where she remained until March 3. She told the staff there she had been using $600 worth of crack cocaine monthly for the past year and a half. The Stonehaven discharge summary reported optimistically that her condition had stabilized and improved and that she was "stating a positive commitment to abstinence and CT Page 789 to medication compliance for her mood disorder." She was discharged "with maximum hospital benefit" back to her community treatment program with the same discharge medications as before. (Pet Ex. 4, 3/5/97 Stonehaven Discharge Summary.)
Despite the hopeful prognosis from Stonehaven in its referral back to her community mental health provider in March, Ms. M. again faltered once back in the community. She did not participate in treatment at the Last Hartford clinic between May and August 1998. (Pet. Ex. 13, at 4.) After resuming treatment, she reported a subsequent cocaine relapse in October 1998, but then "made efforts to recommit to treatment." (Pet. Ex. 5.) A drug screen conducted by ICMHG on November 12, 1998, was, however, positive again for cocaine. (Pet. Ex. 13, at 11.) She then stopped participating in the East Hartford clinic, and her last therapy session there was on December 10, 1998. After that the clinic had no direct contact with her except one telephone call that month; according to the clinician's notes, she asked her clinician in that conversation "if I [the clinician] had informed DCF [of missing appointments after December 10]. When informed I had, she became angry and said she would not continue treatment" there. The East Hartford clinic formally discharged her from its care on March 11, 1999, its discharge summary giving as reasons for the discharge that she had "disengaged/refused services" and "dropped out." (Pet. Ex. 5.)
The ICMHG clinician did receive a telephone call on January 7, 1999, from New Horizons, an inpatient drug treatment program in Bridgeport, saying that she had entered that program. Ms. M. was treated there between January 7 and to January 25, 1999. Id. Since she declined to sign releases for that program, the record reflects no information about the course of that treatment.[6] (Test. Lisa Higgins.)
In March 1999, she began participating in a dual diagnosis program at Wheeler Clinic in New Britain. Although her therapist at Wheeler initially reported to DCF that Ms. M. was participating consistently in treatment, she tested positive for cocaine on April 27, 1999. On May 2, 1999, Wheeler Clinic transferred her to its Hartford dual diagnosis program, which she attended only once and then did not return. (Pet. Ex. 13, at 11.) On June 3, 1999, the Wheeler Clinic discharged her from its drug treatment program because of her repeated unauthorized absences. (Pet. Ex. 12.)
During the period after the neglect finding, Ms. M.'s children were placed for two years with her mother, the maternal grandmother, Ms. Hosea S. During that time Ms. S. supervised Ms. M.'s visits with her children. On September 18, 1998, however, DCF removed the children from the CT Page 790 maternal grandmother's care because the department determined that Ms. S. was allowing Ms. M, in violation of department regulations prohibiting removed children from sleeping in the same house as their biological parents, to do so. (Test. Lisa Higgins.) DCF then placed Keisha and Tyrone in another DCF-licensed foster home. After the children were removed from the maternal grandmother, Ms. M was scheduled to see her children once a week for an hour. of nineteen scheduled visits between September 16, 1998, and February 24, 1999, she missed nine visits, three times because of inpatient treatment in January. Her last visit with her children was on February 24, 1999. She has not seen them since. (Pet. Ex. 13, at 12; test. Lisa Higgins.)
 3. EVENTS FOLLOWING THE FILING OF THE TERMINATION PETITION ON July 26, 1999
Since the filing of the termination petition, there is a gap in the evidence about Ms. M.'s mental health, her substance abuse, or any treatment she may have received. She explained this gap at trial by saying that she had "lust totally stopped giving her [the DCF social worker] any information about myself."
The court infers, from her testimony at trial that she was in Niantic for a while and then placed at an Alternative Incarceration Center (AIC) for a couple of weeks, that in the fall or early winter of 1999 Ms. M. was arrested. The intake sheet for her recent admission at IOL reflects that she reported being on probation in 1999 for assaulting a police officer, although the exact charge or disposition are unclear. (Pet. Ex. 14.) A record from the Genesis Center, Inc. introduced into evidence as Petitioner's Exhibit 6 shows that she sought admission to a partial hospitalization program there on November 10, 1999, was rejected for service because she lived outside the Genesis service area, and was referred to Rivereast for an appointment the next day. Ms. M. testified that she then participated in a Rivereast program, where she claimed she had regular negative urines until she was discharged because of a mishap about what she described to the court as an incorrect claim about being someone's girl friend. At some unspecified time afterwards, she began treatment at the Alcohol Drug Treatment Center (ADRC). ADRC referred her on August 29, 2000, to the Institute of Living after she had a cocaine relapse on August 25 and told the ADRC staff that she was feeling suicidal. She told IOL she had not been in the ADRC "outpatient program recently but had not been attending consistently." (Pet Ex. 14.) Although admitting to using cocaine four days earlier, she claimed to the staff that she had been cocaine free for the previous eleven months and that her longest period of abstinence from cocaine had been for 1 1/2 years ten years earlier. (Id.) CT Page 791
Ms. M. testified at trial that, after being in and out of programs, she had "finally started complying" and been drug free since October 3, 1999, except for the relapse on August 25, 2000, just weeks before the scheduled start of this trial. When asked why she had relapsed on August 25th, she said she "couldn't handle" the stress in her life, a statement similar to what she told the IOL in explaining the relapse — that she had gotten "frustrated" and "overwhelmed."
Ms. M. admitted at trial that she had stopped seeing her children. When asked why, she said that she could not keep seeing her son because he would ask her when he was coming home. She said that it hurt too much to see them crying. She testified that since she did not believe it was right just to see one of her children she also stopped seeing Keisha.
B. THE CHILDREN, KEISHA AND TYRONE
Keisha and Tyrone were removed from their mother's care on June 18, 1996. By the time of trial, they had been in foster care for four years and three months. After first living together in a foster home until April 1997, they were moved into a relative foster placement with their maternal grandmother, to whom they have very close ties. They stayed with her for eighteen months, until September 18, 1998. They were in their next foster home until February 17, 1999, when DCF removed them after another foster child living in the same home touched Tyrone inappropriately. (Test. Lisa Higgins.) After that Keisha and Tyrone were placed separately, but with a mother and daughter who live on separate floors in the same building. While living with their grandmother, they apparently saw their mother regularly, but as the evidence above shows they have seen her very little since then. The maternal grandmother has continued to have weekly, four-hour unsupervised visits with them. ((Test. Lisa Higgins; Pet. Ex. 13 at 6; Pet. Ex. 15).
 II — ADJUDICATORY DECISION[7] A. REUNIFICATION EFFORTS
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111 that such efforts are not appropriate." General Statutes § 17a-112 (c)(1). In this case, the court found at an extension hearing on April 22, 1999, that the department had made reasonable reunification efforts and that continued CT Page 792 such efforts were no longer appropriate.
B. STATUTORY GROUNDS
Trial of a petition to terminate parental rights has two phases, adjudication and disposition. To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes § 17a-112
(c)(3). "In the adjudicatory phase of a termination hearing, the trial court determines if one of the statutory grounds for termination of parental rights is proven by clear and convincing evidence. In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment."In re Tabitha P., 39 Conn. App. 353, 367, 664 A.2d 1168 (1995); Practice Book § 33-3(a).
The adjudicatory date in this case is March 6, 2000, the date of filing of the most recently amended petition.[8] The petitioner claims that the statutory ground of parental failure to rehabilitate exists in this case, pursuant to General Statutes § 17a-112 (c)(3)(B)(1)[9]
While Ms. M. has partially attended to some of the DCF expectations, the overwhelming evidence establishes that as of March 6, 2000, she had neither accomplished such personal rehabilitation as is contemplated by § 17a-112 (c)(3)(B)(1), nor had she achieved such degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her child, this mother could assume a responsible position in the lives of Keisha or Tyrone. Accordingly, the court finds this issue in favor of the petitioner by clear and convincing evidence.
The term "rehabilitation" as used in the statute means "to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems." (Internal quotations omitted; internal citations omitted) In re Eden F., 250 Conn. 674, 706, 741 A.2d 873 (1999) "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In re Danuael D., 51 Conn. App. 829, 840, 724 A.2d 546
(1999). The statutory terminology "personal rehabilitation" thus requires the court to focus on the prospect of restoring a parent "to his or her CT Page 793 former constructive and useful role as a parent." In re Tabitha P.,39 Conn. App. 353, 361, 664 A.2d 1168 (1995). "What is a reasonable time is a factual determination that must be made on a case-by-case basis," depending on the needs and situation of the particular child. In reShannon S., 41 Conn. Sup. 145, 154, 562 A.2d 79, aff'd, 19 Conn. App. 20,560 A.2d 993 (1989).
In conducting the inquiry as to whether the commissioner has established a respondent's failure to rehabilitate by clear and convincing evidence, the trial court must consider:
 • the respondent's rehabilitative status as it relates to the needs of the particular child and
 • whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child. "The statute requires the court to find by clear and convincing evidence that the parent's level of rehabilitation is less than that which would encourage a belief that he or she can assume a responsible position in the child's life within a reasonable time." In re Shyliesh H., 56 Conn. App. 167, 173, 743 A.2d 165 (1999).
"Thus, the trial courts inquiry requires the determination of both the present and past status of the child, and obtaining a historical perspective of the respondent's child caring and parenting." Id. Although the court in the adjudicatory phase may only consider evidence occurring prior to the adjudicatory date in determining whether the statutory grounds have been proven, the court may nonetheless consider later events, up to the time of trial, in "considering whether the degree ofrehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life in a reasonable time." (Emphasis in original.) In re Stanley D., 61 Conn. App. 224, 230 (2000).
Although domestic violence was part of the reason that DCF initially removed Keisha and Tyrone, the overwhelming evidence is that the principal problems impairing Ms. M's ability to be a good parent are her substance abuse and mental illness. In the two years between the finding of neglect and the filing of the TPR petition, she was hospitalized or inpatient at least three times for psychiatric or substance abuse problems:
• at Cedarcrest in September 1997, after she threatened to kill her children's babysitter; CT Page 794
 • at Elmcrest in February 1998, after again having homicidal feelings towards the babysitter; and
• at New Horizons in January 1999 after several cocaine relapses.
In addition, she has been treated in partial hospitalization programs and outpatient community-based programs. In each admission to a program, the records reflect an individual seemingly sincere and motivated to address her mental and addiction problems. Yet the end result, each time, has been the same: ending treatment, going off her medications, relapsing into cocaine abuse, and another round of inpatient or partial hospitalization. Despite her own claim of abstinence for 11 months, she relapsed again on the eve of trial, because, as she explained to the court, she could not handle what was going on in her life.
There have been two intervals during this period which briefly seemed to offer hope of recovery. The February 1998 admission to the Lane Ameen unit at Elmcrest Hospital ended with a discharge summary from Teamworks that optimistically described her as sincere, motivated, and making positive statements about ongoing abstinence. (Pet. Ex. 4). Yet within months, she had again faltered. She did not participate in therapy between May and August 1998. Even after reporting back and again making "efforts to recommit to treatment, she relapsed again in mid-November and had dropped out of ICMHG by mid-December. (Pet Ex. 5.) Then, from October 1999 until August 2000, she again apparently had a period of sobriety that came to a crushing end with another relapse due to "feeling overwhelmed" by the stress in her life. (Pet. Ex 14.)
From the evidence offered at trial, nothing offers any prospect that Kimberly M. has any reasonable prospects of recovery from cocaine use or of sufficiently improved mental health to care for a child in the reasonable future. In September 1997 and February 1998 she was hospitalized after making homicidal threats towards others; her suicidal statements to ADRC and IOL staff in August 2000 are scarcely better, and show, on balance, that any improvement she made, during the 1998 treatment or her sobriety last year and this, ultimately did not change anything. Ms. M. remains a woman who is greatly troubled, with serious psychiatric problems that periodically erupt and a continuing substance abuse problem that she has been unable or unwilling to control. When she does make progress in a hospitalization, as in February 1998, the evidence establishes, and the August 200Q relapse and partial hospitalization confirm, that once back into the community, life eventually becomes more than she can handle. The August 2000 admission to the IOL, the most recent information this court has on her current CT Page 795 rehabilitative status, shows the same course of mental instability leading straight to cocaine use that has characterized her entire life from early adolescence. The evidence therefore shows no improvement in her parenting status.
Furthermore, during this time, DCF offered services to Ms. M. specifically and appropriately directed at helping to address these problems. Unfortunately, she has persisted in the pattern of seeking treatment and then not following through adequately. She has not complied with the DCF expectation to avoid using illegal drugs. Despite her being hospitalized, treated in partial hospitalization programs, and receiving numerous outpatient services in the community for her mental illness and substance abuse, there is no evidence from which the court could conclude that she has made or is likely, in the reasonable or foreseeable future, to make any meaningful progress toward the goals of recovery from substance abuse or stabilized mental health.
Her virtual abandonment of her children since February 1999, the last time she saw either of them, is powerfully probative evidence of the effect of her mental instability and substance abuse on her capacity to parent them effectively. At that point, the TPR petition had not yet been filed. DCF was still under court mandate to seek to reunify her children with her. Yet she testified that her distress, at hearing her almost eight-year-old son, Tyrone, ask when could he return home to her, led her to cease all visitation with either. She testified that it hurt to see them crying. She chose to relieve her personal anguish at seeing her children upset by ending visits with them, rather than overcoming her substance abuse and addressing her mental problems. Whether she could ever have done so, this court cannot now determine, since each episode of seeking help has been followed, inexorably, by a period when she has gone off medications and out of treatment. Unfortunately, Ms. M. never took the steps that were necessary to reunite with her children. As a result of the gaps in her treatment and the resulting lack of rehabilitation, Kimberly M. was no better able to serve as an effective parent for her children in March or September of 2000 than she was in July of 1997. Inre Hector L., 53 Conn. App. 359, 367, 730 A.2d 106 (1999).
The court therefore finds, by clear and convincing evidence, that Ms. Kimberly M. had, as of the adjudicatory date of March 6, 2000, failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of her two children Keisha and Tyrone. Nothing in the evidence as to events since then, up to the time of trial, alters that conclusion in the least. Her continued failures at rehabilitation and recent relapse all confirm that she will not, within a reasonable time, be able to assume a reasonable CT Page 796 position in the life of either child, considering their age and needs.
 III — DISPOSITION
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citation omitted; internal quotation marks omitted.) In re Roshawn R.,51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision, "the court is mandated to consider and make written findings regarding seven factors" specified in General Statutes §§ 17a-112
(d).[10] In re Tabitha P., 39 Conn. App. 353, 664 A.2d 1168 (1995). Unlike the adjudicatory phase, on disposition the court may consider information through the close of the evidentiary hearing. Practice Book § 33-5.
A. REQUIRED STATUTORY FINDINGS
The court makes the following findings as required by General Statutes § 17a-112 (d) and has considered these factors and its findings in its determination of the best interests of the children. In re QuanitraM., 60 Conn. App. 96 (2000), cert. denied 255 Conn. 903 (2000).
 (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent.
The court finds that DCF offered timely and appropriate services to the respondent mother to facilitate her reunion with Keisha and Tyrone. These included repeated referrals to mental health and substance abuse providers.
 (2) Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended.
As discussed in the text above, DCF made reasonable efforts to reunite the family. To reunify the children with their mother, DCF offered the services listed in the above paragraph. These were the services that would help the respondent mother, if she availed herself of them and completed the programs offering them, to overcome the drug and alcohol addiction and address the mental illness that led to DCF involvement in CT Page 797 her family and removal of her children. The services provided to the mother were reasonably appropriate efforts to reunite mother and children.
 (3) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
No such court order was ever entered in this case.
 (4) Finding regarding the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Both children know their mother. When she still visited with them, her interactions with each were positive. But after almost eighteen months without any visits from her, Tyrone no longer speaks affectionately about her. Keisha still says that she loves her mother but states that she does not want to live with her.
Both children are strongly bonded to and love their maternal grandmother, with whom they lived for 18 months.
Since February 1999, Keisha has lived with Ms. Hermine G., who has provided a suitable home for her and been appropriately attentive to the child's needs. She has adjusted well to this setting but would prefer to live with her grandmother.
Tyrone has lived with Ms. Hermine G's daughter, Ms. Lori C., in the same building as Keisha. He is very happy there, and she has been attentive to his special needs. The two children see each other daily.
(5) Findings regarding the age of the children.
Keisha was born on April 1987, was 13 1/2 years old at the time of the TPR trial and is now close to 14 years old. Tyrone was born on March 1991. At the time of trial, he was 9 1/2 years old, and is now close to ten years old.
(6) Finding regarding the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child toCT Page 798 return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
The principal barrier to reunification of the respondent mother with her children has been her cocaine addiction and mental illness, which together have rendered her unable to take care of their needs adequately. Although Kimberly M. has made sporadic efforts to address her addiction to cocaine, she has not been successful in those efforts. Although mental illness, unlike one's first use of illegal drugs, is never a conscious choice, how one responds to mental illness does have volitional components. Here Ms. M. repeatedly stopped taking her medications and stopped attending her outpatient and community-based therapy services. While in treatment, she would not always follow treatment recommendations, such as abstinence from cocaine. Continuing to abuse illegal substances, not remaining in treatment for her mental health issues, Ms. M. has not made adequate efforts to adjust her conduct to make it in the best interest of her children to be reunited with them. By ceasing all visits with them in February 1999, she has shown no interest in maintaining any contact with them since then, and thus made no efforts to continue her relationship with them.
 (7) Finding regarding the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
No unreasonable act or conduct of any person has prevented Ms. M. from having a meaningful relationship with either child. Nor has her economic circumstances limited such a relationship. Her substance abuse and mental illness resulted in the present situation. DCF has taken all reasonable steps appropriate to help her maintain her relationship with her children.
B. BEST INTERESTS OF THE CHILDREN
From the evidence offered at trial, the court finds by clear and convincing evidence, for the reasons stated, that the best interest of CT Page 799 each child requires termination of the parental rights of Ms. Kimberly M.
Keisha is now thirteen years old. She has been in four foster homes after being removed for her mother's care more than four years ago. At the time of trial, she had had no contact with her mother for almost 1 1/2 years. Although she loves her mother, she does not want to live with her. Her mother remains unable to care for her. She wants to go live with her paternal aunt and cousins in Georgia, as the DCF permanency plan proposes. In her adolescent years, she will need the nurture, love and guidance of a responsible caretaker who can counsel and support her through the difficult years she now enters. While temptations and risks may await this young woman, equally so does the prospect of a productive and fulfilled adult life if she can successfully navigate the years ahead. It is clear, from the evidence, however, that Kimberly M., unable to care for herself, does not have the ability to be the person to guide her daughter through the challenging years ahead
Tyrone has also been in four foster homes over the last four years. At age nine, and almost ten, years old, he is younger than his sister but has his own very specialized needs of his age. At his age, he very much needs the stability and continuity of permanent caretakers.
The DCF permanency plan is one that offers Keisha and Tyrone a reasonable hope of maintaining the two familial bonds that have nourished them in recent years, their relationship with each other and with their maternal grandmother. Both, the paternal aunt in Georgia, with whom DCF proposes to place Keisha, and the maternal aunt and uncle in Maryland, with whom DCF would proposes to place Tyrone, plan to help these two siblings maintain contact with each other. Both relatives plan to help them maintain a close relationship with the maternal grandmother. The relatives will even permit contact, letters at first and then phone calls and possibly visits, with the biological parents, if the letters and other contacts are not detrimental to the children.
Their mother is totally unable to meet the needs of either child. After four years in foster care waiting for their mother to rehabilitate herself, both children now need permanency, continuity, and stability — the certainty of who they will be with, who will set the rules they live by, provide the guidance and structure their lives require, and offer the nurture and support a growing child needs.
Abused as a child, mentally ill, using alcohol and illegal drugs in her teen years, and hospitalized frequently since, Kimberly M. has faced many difficulties. When she testified that she stopped visiting her children because it hurt too much to see them crying, the pain and sorrow she had CT Page 800 experienced because of that decision was obvious to all in the courtroom. Yet that was the decision she made, along with all the other decisions she has made — in particular, not to follow through consistently with her mental health counseling and not to stay drug-free. She must now live with the consequences of those decisions. In deciding whether the best interests of these two children would be served by terminating her parental rights, the court must consider all the evidence it saw and heard. Her attorney asked, in his closing argument, "When is it ever too late?" to re-establish the parental bond. The only answer that this judge believes is possible on this record is that, on all the evidence, it is now too late. DCF offered Ms. M. many services and opportunities to overcome the terrible problems she faces. While the court recognizes the difficulty that either of these problems poses to Ms. M., the court must, in the dispositional phase, consider the best interests of the two children. The court finds, by clear and convincing evidence, that it is in the best interest of each child, Keisha and Tyrone, to terminate the parental rights of Kimberly M.
The court thereby grants the termination petitions as to the respondent mother, Ms. Kimberly M., and orders that her parental rights are hereby terminated as to both children. The Commissioner of DCF is hereby appointed statutory parent of Keisha for the purpose of securing an adoptive family. The Commissioner shall file with this court no later than 60 days following the date of judgment a written report of efforts to effect such a permanent placement and file further reports as are required by state and federal law. As the Commission has neither pursued nor withdrawn its petition against Tyrone's father, the action against Tyrone H., Sr., remains pending further order of the court; the court thus orders that the minor child Tyrone remain committed to the Commissioner.
SO ORDERED.
BY THE COURT
 STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT CHILD PROTECTION SESSION